UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

EQUAL EMPLOYMENT
OPPORTUNITY
COMMISSION,

Plaintiff,                                        Civil Action No. 21-CV-3122-ENV-LGD

      v.

STARDUST DINER, INC. D/B/A
COLONY DINER,

      Defendant.

---

**PLAINTIFF EEOC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR DEFAULT JUDGMENT UNDER RULE 55(B)(2)**

Service Date: April 28, 2023

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................... 1

I.    SUMMARY OF RELEVANT FACTS ................................................................ 2

      A.    Anny Benitez-Roa ................................................................................... 4

      B.    Julia Rondeau ......................................................................................... 5

      C.    Natalie Escorza ....................................................................................... 6

      D.    Alyssa Cosgrove ..................................................................................... 7

      E.    Donna Maiorano ..................................................................................... 8

      F.    Christina Swenson ................................................................................. 9

      G.    Jelyssa Fuertes ..................................................................................... 10

      H.    Page Swinerton ..................................................................................... 10

      I.    Paula Schuricht ................................................................................... 11

      J.    Jessica Costa ......................................................................................... 11

II.   LEGAL STANDARD FOR ENTRY OF DEFAULT JUDGMENT ................. 12

III.  ARGUMENT ..................................................................................................... 13

      A.    The Well-Pled Allegations in the Complaint Provide a Sufficient Basis For
            Entry of Default Judgment Against Defendant. ............................................. 13

            1.    Defendant is Liable for the Harassing Conduct of its Owners and its Non-
                  Supervisory Employees. ................................................................. 16

            2.    Defendant Constructively Discharged Julia Rondeau by Creating and
                  Maintaining an Intolerable Hostile Work Environment. ................................ 17

      B.    The Claimants' Declarations Establish an Appropriate Basis to Award the
            Maximum Amount of Monetary Damages Allowed Under Title VII for an
            Employer This Size. ....................................................................................... 18

            1.    The Claimants Should Each Be Awarded Compensatory Damages of $50,000
                  ................................................................................................. 19

            2.    The Evidence Easily Supports an Award of $50,000 for Each Claimant ....... 21

            3.    The Court Should Award Punitive Damages Because George and Thomas

Strifas' Conduct was Egregious and Done in Reckless Indifference to their Employees' Federally Protected Rights ....................................................... 24

**C.** **The Court Should Enter an Injunctive Relief to Prevent Further Harassment at Colony Diner** ........................................................................................... **27**

**CONCLUSION** ............................................................................................. **30**

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Albermarle Paper Co. v. Moody*,
    422 U.S. 405 (1975) ................................................................................................. 27

*Antoine v. Brooklyn Maids 26, Inc.*,
    489 F. Supp. 3d 68 (E.D.N.Y. 2020) ...................................................................... 25

*Bennett v. Luigi's Italian Rest.*,
    No. 18-1295-JTM, 2020 WL 1503472 (D. Kan. Mar. 30, 2020) ........................... 25

*Bergerson v. New York State Office of Mental Health*,
    652 F.3d 277 (2d Cir. 2011) .................................................................................... 18

*Berkman v. City of New York*,
    705 F.2d 584 (2d Cir.1983) ..................................................................................... 27

*Bridgeport Guardians Inc. v. City of Bridgeport*,
    933 F.2d 1140 (2d Cir.1991) ................................................................................... 27

*Carrero v. New York City Housing Authority*,
    890 F.2d 569 (2d Cir. 1989) .................................................................................... 26

*Cross v. New York City Transit Auth.*,
    417 F.3d 241 (2d Cir. 2005) .................................................................................... 21

*Cruz v. Coach Stores, Inc.*,
    202 F.3d 560 (2d Cir. 2000) .................................................................................... 14

*Cush-Crawford v. Adchem Corp.*,
    271 F.3d 352 (2d Cir. 2001) .................................................................................... 25

*Dash v. Bd. of Educ. of City Sch. Dist. of New York*,
    238 F. Supp. 3d 375 (E.D.N.Y. 2017) ..................................................................... 22

*DeCurtis v. Upward Bound Int'l, Inc.*,
    No. 09 CIV. 5378 RJS, 2011 WL 4549412 (S.D.N.Y. 2011) ................................ 20

*Deters v. Equifax*,
    202 F.3d 1262 (10th Cir. 2000) ............................................................................... 26

*Dotson v. City of Syracuse*,
    No. 5:04-CV-1388 ................................................................................................... 19

*Duch v. Jakubek*,
    588 F.3d 757 (2d Cir. 2009) ............................................................................. 14, 16

*E.E.O.C. v. DCP Midstream,*
    608 F.Supp.2d 107 (D. Me.)......................................................................................30

*E.E.O.C. v. KarenKim, Inc.,*
    698 F.3d 92 (2d Cir. 2012) ...........................................................................27, 28, 30

*Eagle Assocs. v. Bank of Montreal,*
    926 F.2d 1305 (2d Cir. 1991) ...................................................................................12

*EEOC v. Pac. Fun Enterprises,*
    No. CV17-00482ACK-RT, 2020 WL 406681 (D. Haw. Jan. 7, 2020)........................25

*EEOC v. Scolari Warehouse Mkts.,*
    488 F. Supp. 2d 1117 (D. Nev. 2007) .......................................................................25

*EEOC v. Suffolk Laundry Servs.,*
    48 F. Supp. 3d 497 (E.D.N.Y. 2014) .........................................................................15

*Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.,*
    350 F. Supp. 3d 199 (E.D.N.Y. 2018)..............................................................28, 29, 30

*Equal. Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.,*
    No. 14-CV-3673 (KAM)(JO), 2020 WL 1083771 (E.D.N.Y. Mar. 6, 2020)...................21

*Faragher v. City of Boca Raton,*
    524 U.S. 775 (1998) ................................................................................................16

*Fitzgerald v. Henderson,*
    251 F.3d 367-68 (2d Cir. 2001) ...............................................................................17

*Fustok v Conticommodity Servs., Inc.,*
    873 F2d 38 (2d Cir 1989) ........................................................................................13

*Greathouse v. JHS Sec.,*
    784 F.3d 105 (2d Cir. 2015) .....................................................................................13

*Guzman v. News Corp.,*
    No. 09 CIV. 09323 LGS, 2013 WL 5807058 (S.D.N.Y. Oct. 28, 2013) ....................15

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 17 (1993) ..................................................................................................13

*Kolstad v. American Dental Ass'n,*
    527 U.S. 526 (1999) ................................................................................................24

*Lewis v. Am. Sugar Ref., Inc.,*
    325 F.Supp.3d 321 (S.D.N.Y. 2018) .........................................................................26

*Lewis v. Am. Sugar Ref., Inc.,*
    No. 14-CV-02302 (CRK), 2018 WL 4179053 (S.D.N.Y. Aug. 15, 2018)....................28

*Lyons P'ship, L.P. v. D & L Amusement & Ent., Inc.*,
    702 F. Supp. 2d 104 (E.D.N.Y. 2010) ...................................................................... 12, 13

*Maslowski v. Crimson Const. Corp.*,
    No. CV 11-556 VVP, 2013 WL 752199 (E.D.N.Y. Feb. 27, 2013) .................................. 13

*Meacham v. Knolls Atomic Power Lab.*,
    381 F.3d 56 (2d Cir. 2004), *vacated on other grounds sub nom. KAPL, Inc. v.*
    *Meacham*, 544 U.S. 957 (2005) ................................................................................ 19, 20

*Meritor Sav. Bank v. Vinson*,
    477 U.S. 57 (1986) ........................................................................................................ 13

*Messer v. Fahnestock & Co.*,
    No. 103CV-04989-ENV-JMA, 2008 WL 4934608 (E.D.N.Y. Nov. 18, 2008) ............... 15

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002) ....................................................................................................... 22

*Notaro v. Fossil Indus., Inc.*,
    820 F. Supp. 2d 452 (E.D.N.Y. 2011) ........................................................................... 17

*Olsen v. Cnty. Of Nassau*,
    615 F. Supp. 2d 35 (E.D.N.Y. 2009) ................................................................... 18, 19, 20

*Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*,
    310 F.3d 43 (2d Cir. 2002) ..................................................................................... 19, 21

*Patterson v. Balsamico*,
    440 F.3d 104 (2d Cir. 2006) ........................................................................................ 19

*Pennsylvania State Police v. Suders*,
    542 U.S. 129 (2004) ...................................................................................................... 17

*Perdue v. City Univ.*,
    13 F. Supp. 2d 326 (E.D.N.Y. 1998) ............................................................................. 21

*Priestley v. Headminder*,
    647 F.3d 497 (2d Cir. 2011) ......................................................................................... 12

*Pucino v. Verizon Wireless Communs.*,
    618 F.3d 112 (2d Cir. 2010) ......................................................................................... 14

*Quinby v. WestLB AG*,
    No. 04 CIV.7406 WHP, 2008 WL 3826695 (S.D.N.Y. 2008) ....................................... 20

*Richardson v. New York State Dep't of Corr. Serv.*,
    180 F.3d 426 (2d Cir. 1999) ......................................................................................... 16

*Rios v. Enter Ass'n. Steamfitters Local Union 638 of U.A.*,
    860 F.2d 1168 (2d Cir. 1988) ....................................................................................... 26

*Santillan v. Henao*,
 822 F. Supp. 2d 284 (E.D.N.Y. 2011)..................................................................26

*Sowemimo v. D.A.O.R. Sec.*,
 43 F. Supp. 2d 477 (S.D.N.Y. 1999)....................................................................15

*Terry v. Ashcroft*,
 336 F.3d 128 (2d Cir. 2003)................................................................................14

*Townsend v. Benjamin Enter.*,
 679 F.3d 41 (2d Cir. 2012).................................................................................16

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*,
 109 F.3d 105 (2d Cir. 1997)...............................................................................13

*United States v. City of New York*,
 717 F.3d 72 (2d Cir. 2013).................................................................................29

*United States v. City of New York*,
 897 F. Supp. 2d 30 (E.D.N.Y. 2012)...................................................................19

*Vasbinder v. Scott*,
 976 F.2d 118 (2d Cir. 1992)...............................................................................24

*Watson v. E.S. Sutton, Inc.*,
 No. 02 CIV. 2739, 2005 WL 2170659 (S.D.N.Y. Sept. 6, 2005), *aff'd*, 225 F. App'x
 3 (2d Cir. 2006)..................................................................................................20

*Winter v. Nat. Resource Def. Couns*,
 555 U.S. 7 (2008)...............................................................................................27

**Statutes**

42 U.S.C. § 1981a..........................................................................................................18

42 U.S.C. § 1981a(b)(1)............................................................................................18, 24

42 U.S.C. § 1981a(b)(3)................................................................................................18

42 U.S.C. § 2000e.............................................................................................................1

42 U.S.C. § 2000e–2(a)(1)............................................................................................13

42 U.S.C. § 2000e–5(g)(1)............................................................................................27

Civil Rights Act of 1964 Title VII..........................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 55...........................................................................................................12

Fed. R. Civ. P. 55(a) ................................................................................................... 1, 12

Fed. R. Civ. P. 55(b)(2)................................................................................................ 1, 12

Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic, June 2016, *available at* https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686311 ........................................................................... 30

United States Bureau of Labor Statistics Consumer Price Index Calculator, *available at* https://www.bls.gov/data/inflation_calculator.htm ............................................. 20

## PRELIMINARY STATEMENT

Plaintiff Equal Employment Opportunity Commission ("EEOC") commenced this action against Defendant Stardust Diner, Inc., d/b/a Colony Diner ("Defendant," "Diner" or "Colony Diner") on June 2, 2021, alleging that Defendant violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by subjecting its female employees to a hostile work environment based on sex. *See* ECF No. 1, Complaint ("Compl."). The EEOC further alleges that Defendant subjected this class of female employees to tangible employment actions, including constructive discharge, and different terms and conditions of employment because of their sex, female.  Compl. ¶¶ 19-25.

Defendant filed its Answer on September 10, 2021. ECF No. 13. Defendant's attorneys filed a Motion for Leave to Withdraw as Counsel for Defendant on September 2, 2022. ECF No. 34. The Court ordered Defendant to obtain new counsel in three orders in September and October 2022. *See* ECF Nos. 37, 42, 44. The Court stated that if "new counsel does not appear for the corporate Defendant in this case by [November 14, 2022], a default will be entered against the Defendant pursuant to Fed. R. Civ. P. 55(a)." ECF No. 44. This order was served on Defendant at the address listed with the New York Secretary of State for service of process, which is also its principal place of business. ECF No. 45. Colony Diner is still open and operating. Riccardi Decl. ¶ 3. However, Defendant did not appear through counsel by the Court's deadline and has not done so to date. The EEOC therefore obtained an entry of default against Defendant in accordance with Fed. R. Civ. P. 55(a). ECF No. 47.

The EEOC now seeks a default judgment against Defendant pursuant to Fed. R. Civ. P. 55(b)(2), including appropriate relief for ten (10) Claimants: Anny Benitez-Roa, Christina Swenson, Donna Maiorano, Julia Rondeau, Natalie Escorza, Jelyssa Fuertes, Page Swinerton,

1

Paula Schuricht, Jessica Costa, and Alyssa Cosgrove ("Claimants") in the amount of **$542,660**, plus prejudgment interest on lost wages, and appropriate injunctive relief.

## I.       SUMMARY OF RELEVANT FACTS

Colony Diner is a diner on Long Island owned by cousins George Strifas and Thomas Strifas. *See* ECF No. 1, Compl. ¶ 15, 16; ECF No. 13, Ans. ¶ 15, 16. George and Thomas Strifas, who are both in their 50s, treated the Diner like it was "Studio 54," and their female employees said that working in the Diner was "like working in a men's club in the 1950's." Declaration of Christina Swenson ¶ 7, Riccardi Decl. at Ex. 8; Declaration of Donna Maiorano ¶ 5, Riccardi Decl. at Ex. 7. George and Thomas Strifas required female employees to wear tight or revealing clothing and would constantly comment on their bodies, saying things like "your ass looks so hot." Declaration of Jesslyn Fuertes ¶ 6, Riccardi Decl. at Ex. 9; Declaration of Julia Rondeau ¶¶ 7-10, Riccardi Decl. at Ex. 4; Maiorano Decl. ¶¶ 8-10; Declaration of Anny Benitez-Roa ¶¶ 8-9, Riccardi Decl. at Ex. 3; Declaration of Natalie Escorza ¶¶ 5-7, Riccardi Decl. at Ex. 5; Swenson Decl. ¶ 8; Declaration of Paula Schuricht ¶ 5, Riccardi Declaration at Ex. 11; Declaration of Jessica Costa ¶ 8, Riccardi Decl. Ex. 12; Declaration of Alyssa Cosgrove ¶ 8, Riccardi Decl. at Ex. 6. George Strifas would ogle his female employees, who were judged based on their looks. *Id*. George Strifas even tried to control their diet because he was concerned that they would get fat. Rondeau Decl. ¶ 9; Swenson Decl. ¶ 8. Meanwhile, male employees were not subjected to these appearance requirements and were favored by being assigned to more tables in order to receive more tips. Rondeau Decl. ¶9; Swenson Decl. ¶ 8; Schuricht Decl. ¶ 10.

Every shift, female employees were subjected to insulting and degrading comments from George or Thomas Strifas about female customers or co-workers like "isn't she hot?" or

"I want to fuck you so hard" and questions like "I wonder what she is wearing under that?", "were you fucked too hard?", "do you like it rough?", as well as inquiries about the frequency and details of their sex lives. Fuertes Decl. ¶¶ 6, 12; Rondeau Decl. ¶¶ 12, 18; Maiorano Decl. ¶¶ 11-13; Swenson Decl. ¶ 10. When not pleased with the responses or appearances of their female staff, George and Thomas Strifas lashed out at them, calling them "fat" or "slobs," or gave them unfavorable sections where they would earn less. Swenson Decl. ¶ 11; Schuricht Decl. ¶ 9; Rondeau Decl. ¶ 14. George and Thomas Strifas did not yell at the men they employed. Swenson Decl. ¶ 8; Schuricht Decl. ¶ 10; Maiorano Decl. ¶ 7.

Although middle-aged, George Strifas also tried to date his young female staff, pressured some to engage in sex acts with him, and even sexually assaulted a teenaged hostess. Benitez-Roa Decl.¶¶ 18-22; Rondeau Decl. ¶ 20; Swenson Decl. ¶ 6; Costa Decl. ¶¶12-14. He would frequently forcibly touch female employees against their will. Benitez-Roa Decl. ¶¶ 14, 16-18; Fuertes Decl. ¶ 5-7; Maiorano Decl. ¶ 14; Rondeau Decl. ¶ 11; Escorza Decl. ¶ 14, 16; Cosgrove Decl. ¶ 9-10. George Strifas would regularly touch women on their backs, hips, and waists, rub their shoulders and backs and grab them by the neck or touch their thighs. Benitez-Roa ¶ 14, Escorza Decl. ¶ 14; Fuertes Decl. ¶ 5-7; Cosgrove Decl. ¶ 9-10; Rondeau ¶ 11; Maiorano ¶ 14. This behavior took place in the open and was often witnessed by other female employees. Swenson Decl. ¶ 17; Cosgrove Decl ¶ 10.

George and Thomas Strifas encouraged their male staff to treat women who worked at the Diner as sexual objects. Fuertes ¶¶ 12-13; Maiorano Decl. ¶ 18; Rondeau Decl. ¶ 21-22. For example, Joel LNU, a waiter, would constantly hit on other waitresses, make sexual comments to them, and give them unwanted backrubs—all in the presence of George and Thomas Strifas. Rondeau Decl. ¶¶ 23-26; Maiorano Decl.¶¶ 19-21. Joel's unchecked

3

behavior got so bad that he followed a waitress home and sexually assaulted her. Rondeau Decl. ¶ 26. Busboys also would frequently proposition the young hostesses for sex and would grab and press their bodies against waitresses and hostesses despite their objections. Rondeau ¶ 22; Swinerton ¶¶ 14-22; Cosgrove ¶ 12; Escorza ¶¶ 21-35; Benitez-Roa ¶¶ 25-27.

Defendant had no policies regarding sexual harassment or avenues for its staff to complain. Compl. ¶17; Rondeau Decl. ¶ 27; Maiorano Decl. ¶ 6. Moreover, they feared retaliation if they would reject George Strifas' advances or complain about their mistreatment because of George and Thomas Strifas' vindictiveness and threats. Cosgrove Decl. ¶¶ 9, 11; Swenson Decl. ¶¶ 7, 11; Escorza Decl. ¶ 8; Maiorano Decl. ¶ 6; Benitez-Roa Decl. ¶ 12; Rondeau Decl. ¶ 11.

### A. Anny Benitez-Roa

Anny Benitez-Roa began working as a hostess at Colony Diner in the summer of 2018, when she was seventeen years old. Benitez-Roa Decl. ¶ 3. Benitez-Roa consistently experienced sexual harassment that escalated once she turned eighteen and included being sexually assaulted by George Strifas. *Id.* at ¶¶ 7, 12-14, 16-22. George Strifas made numerous sexual comments about her appearance like "you look really hot," that he was an "ass guy," and asking her to show more cleavage at work. *Id.* at ¶ 9, 17.

As soon as Benitez-Roa turned eighteen, George Strifas's conduct escalated. *Id.* at ¶¶ 13-14. The day that Benitez-Roa turned eighteen he gave her one-hundred dollars and told her to go buy herself something nice. *Id.* at ¶ 13. Thereafter, George Strifas started to touch her intimately at work—grabbing her waist and caressing her lower back, butt, and thighs. *Id.* at ¶¶ 14, 16-18. George Strifas touched Benitez-Roa's genitals through her leggings behind the counter. *Id.* at ¶ 19.

4

Then, in late 2020, George Strifas asked Benitez-Roa on a date. *Id.* at ¶ 20. While on the date, he kissed Benitez-Roa and inserted his finger into her vagina while in the car on the way back to the diner. *Id.* at ¶ 22. Benitez-Roa was uncomfortable with George Strifas's conduct but did not think she could say anything. *Id*. She was pregnant and depended on the income to support herself. *Id.* at ¶ 15. Benitez-Roa felt that George Strifas targeted her because she was vulnerable: George knew that she was a victim of domestic violence.  *Id.* at ¶ 24.

As a result of the harassment, Benitez-Roa became very depressed and lacked the strength to seek help. *Id.* at ¶¶ 29, 31. She dreaded going to work and felt disgusted with herself for letting George Strifas harass her. *Id.* at ¶ 29. The stress of the situation caused her to lose weight and strained her friendships. *Id*. at ¶ 31-32.

   **B.    Julia Rondeau**

Julia Rondeau began working as a server at the Colony Diner when she was a nineteen-year-old college sophomore; she left in August of 2015, due to the constant and pervasive sexual harassment she endured.  Rondeau Decl. ¶ 3. Every shift, either George or Thomas Strifas tried to engage Rondeau in conversations about the appearance of female employees and customers in a sexual or critical manner. *Id.* at ¶¶ 10-16. They would constantly comment or inquire about her sex life. *Id*. at ¶ 16-18. Rondeau constantly worried that the sexual banter would turn physical. *Id.* at ¶ 20. George Strifas would often invade her physical space and touch her shoulders. *Id.* at ¶ 11. One of Rondeau's coworkers, a waitress named Amanda, complained to Rondeau that George Strifas tried to have sex with her in his office. *Id.* at ¶ 20.

Other male employees followed the example set by George Strifas and harassed Rondeau, eventually resulting in her being sexually assaulted by a male server. *Id.* at ¶¶ 21-26. A busboy, Pedro LNU, would frequently grab her and she would pull away in obvious discomfort.

*Id.* at ¶ 22. George and Thomas Strifas would witness these incidents and laugh at Rondeau's reaction, which only encouraged Pedro's behavior. *Id.*

A waiter named Joel would touch her inappropriately on the small of her back and whisper in her ear about her underwear or how attractive she was. *Id.* at ¶ 23. On multiple occasions Joel would trap her behind the counter and grab her butt. *Id.* Thomas Strifas witnessed Joel grabbing Rondeau but ignored it. *Id.* at ¶ 25. One day after work, Joel followed Rondeau home to her sorority house. *Id.* at ¶ 26. Not knowing what to do, Rondeau invited Joel inside, at which point he grabbed her butt and forced his hand down the front of her pants touching her genitals. *Id.* After Rondeau reacted in distress, Joel left. *Id.*

The harassment at Colony Diner caused Rondeau to experience severe anxiety, including panic attacks, and caused her eating disorder to return. *Id.* at ¶¶ 30-31. Because she could not tolerate the harassment anymore, Rondeau quit in August 2015. *Id.* at ¶ 32. However, her experience at Colony Diner was scarring and still effects the jobs she accepts. *Id.* at ¶ 33.

### C. **Natalie Escorza**

Natalie Escorza started working at Colony Diner as a hostess in November of 2019, when she was seventeen, and continued to work there until June of 2021. Escorza Decl. at ¶ 3. George Strifas would constantly comment on her body, telling her that she was beautiful and had a very nice and fit body, encourage her to wear tight clothing, and ogle her. *Id.* at ¶¶ 6-7, 9-10. He also constantly asked her about her sex life. *Id.* at ¶¶ 12-13. Busboys and kitchen staff followed George Strifas's example by constantly objectifying Escorza. *Id.* at ¶¶ 24-35.

George Strifas would also touch Escorza in intimate ways without her consent. *Id.* at ¶ 14, 16. Once, Escorza was at the cash register leaning over with her forearms on the counter when George Strifas came up behind her, put his hands on her waist, and pressed his genitals

6

area against her butt over her clothing and held it there. *Id.* at ¶ 14. After that, George Strifas would regularly caress her shoulders, place his hands on both sides of her waist, and touch her back. *Id.* at ¶ 16.

Again, the men at Colony Diner followed George Strifas' lead. *Id.* at ¶¶ 21-35. Multiple times a shift, Pedro, a busboy, would try to grab her, make sexual comments about her body, and proposition her for sex. *Id.* at ¶¶ 21-31. A manager witnessed some of these interactions, but just laughed. *Id.* at ¶ 30. And Escorza also told Thomas Strifas about the harassment, but he failed to do anything. *Id.* at ¶ 27. A server in his forties or fifties, would also proposition her and attempt to hug her. *Id.* at ¶ 31-32. Another busboy, on at least ten different occasions, would tell Escorza that if she had sex with him, it would "blow her mind," and comment that she had a beautiful body. *Id.* at ¶¶ 33-34.

The harassment by George Strifas triggered memories of sexual assaults that she had suffered in the past. *Id.* at ¶ 19. Because of her experience, Escorza slept more, lost a noticeable amount of weight, became more anxious, and had less energy. *Id.* at ¶¶ 36-38.

### D. <u>Alyssa Cosgrove</u>

Alyssa Cosgrove began working as a hostess at Colony Diner in June 2017, when she was a seventeen-year-old high school senior, and she worked there until December 2019. Cosgrove Decl. at ¶¶ 3-4. George Strifas approached her while she was a customer at the diner, told her she was beautiful, and asked her to work with him. *Id.* at ¶ 3.

George Strifas would constantly comment on her breasts and butt and encourage her to wear more revealing clothes. *Id.* at ¶ 8. He would ask her if she had a boyfriend and tell her he would love to take her out. *Id.* George Strifas would also constantly touch her in an intimate and inappropriate manner while at work. *Id.* at ¶ 9. He would massage Cosgrove's shoulders and

7

caress her lower back. *Id.* Cosgrove was afraid to tell George Strifas to stop because he was known to have a volatile temper and she had been retaliated against by his cousin Thomas Strifas for complaints in the past. *Id.* at ¶¶ 9, 11. Instead, she would try to move away or pretend to need a bathroom break. *Id.* at ¶ 9. Cosgrove was also grabbed and harassed by a busboy named Pedro. *Id.* at ¶ 12. Pedro would reach out and caress her back whenever she would pass him and often tried to put his arm around her waist. *Id*. He would also make disgusting sexual comments to her in Spanish and sent her sexually explicit messages on social media. *Id.*

Cosgrove also witnessed George Strifas repeatedly sexually molest another teenager, Anny Benitez-Roa . *Id.* at ¶ 10. Cosgrove would watch as George Strifas would touch and caress Benitez-Roa, and would hear him tell her that he wanted to have sex with her in the back of the diner. *Id.*

As a result of the sexualized environment, Cosgrove started to become anxious about her appearance and developed an unhealthy obsession about how she looked. *Id.* at ¶ 13. She felt embarrassed, depressed, and anxious about the sexual harassment she had to endure and withdrew from her family until she quit in 2019.  *Id.*at ¶ 14-15.

### E.  <u>Donna Maiorano</u>

Donna Maiorano was a waitress at Colony Diner for many years before quitting in 2018. Maiorano Decl. ¶ 3. George Strifas would constantly try and engage Maiorano in unwanted sexual banter: he would call her a "MILF," an acronym for "mother I would like to fuck," show her pornography on his phone, and make crude inquiries about her sex life. *Id.* at ¶¶ 8, 12-13, 15. He would sometimes grab her neck and hair to simulate hair-pulling during sex. *Id.* at ¶ 14. Maiorano was also subjected to unwanted attention from a waiter, Joel, who would constantly proposition her for dates and "rub against" her without her permission. *Id.* at ¶¶ 19-20. Despite

8

Maiorano's apparent discomfort, neither George nor Thomas Strifas would do anything to discourage it. *Id.* at ¶ 21. Instead, they would just make jokes with Joel, leading to his continued behavior. *Id.* Maiorano also witnessed George Strifas preying on hostesses, some of whom were teenagers. *Id.* at ¶ 8.

The constant abuse, unwelcome physical contact, and intrusive crude sexual questions disgusted Maiorano, but she felt compelled to tolerate it since pushing back would lead to retaliation. *Id.* at ¶ 16. Eventually she quit.

### F. <u>Christina Swenson</u>

Christina Swenson worked as a waitress at Colony Diner for roughly two years. Swenson Decl. ¶ 3. While she was there, she was subjected to constant harassment by George and Thomas Strifas. *Id*. at ¶¶ 7-10.  They would frequently make crude inquiries into her sex life, constantly comment on her body, and show extreme favoritism towards the male staff. *Id*. at ¶¶ 8-10, 12, 14, 16. Every conversation or interaction was steered towards sex, often in the crudest ways. *Id.* at ¶ 10. If she objected to their sexist behavior, or refused to play along, they would retaliate against her by giving her fewer tables or a worse section to wait on, thereby reducing her income. *Id.* at ¶ 11, 19.

Thomas Strifas would repeatedly display his clothed, but erect, penis to her at work. *Id.* ¶ 15. In addition, she witnessed George Strifas' harassment of a fellow waitress, Amanda, whom George Strifas would coerce into performing oral sex on him in his basement office and ridicule in front of the rest of the staff. *Id.* at ¶ 6. And George Strifas would constantly maneuver to get Swenson alone with him. *Id.* at ¶ 13. The constant abuse from George and Thomas Strifas caused her severe emotional distress and humiliation. *Id.* at ¶ 18. While working at the diner, Swenson developed stomach issues and lost fifteen pounds. *Id.* at ¶ 20.

### G. **Jelyssa Fuertes**

Jelyssa Fuertes started working as a hostess at Colony Diner in Fall of 2011 when she was a freshman in college and needed a job. Fuertes Decl. ¶ 3. During her time working at Colony Diner, George Strifas constantly tried to touch her and would regularly make inappropriate comments such as that he could "Fuck [her] hard," or that she was "hot." *Id.* at ¶ 6. George Strifas would ask her to pick up menus so he could watch her while he was aroused. *Id.* When she worked in the cash area, he would open the cash register to make the area tighter and then move his body between Fuertes and the backbar to make contact with her butt. *Id.* at ¶ 7.

On multiple occasions, George Strifas asked for inappropriate sexual photos of her and a high school friend of hers, Sarah, whom George was dating and who also worked at the Diner. *Id.* at ¶ 9. The last straw for Fuertes came in 2016 when she was sitting with George in a diner booth discussing an issue with her taxes when he reached over and grabbed her thigh. *Id.* at ¶ 5.

Because of her experience at Colony Diner, Fuertes lost her self-confidence, constantly worried about her appearance, and felt ashamed. *Id.* at ¶ ¶ 19-20.

### H. **Page Swinerton**

Page Swinerton worked at Colony Diner as a hostess while she was in school, from March 2021 to June 2021. Declaration of Page Swinerton ¶ 3, Riccardi Decl. at Ex. K. Thomas Strifas would constantly stare at her breasts and butt, making her uncomfortable. *Id.* at ¶ ¶ 7, 9, 10. The busboys would also show Thomas Strifas pictures of women on their phone – which Swinerton could see—, while making sexual comments, such as that they would "love to fuck her." *Id.* at ¶ 11.

Swinerton was also harassed by several busboys. *Id.* at ¶ 14-21.  Pedro, a busboy, often leered at Swinerton, and he would regularly touch the waists, backs, and butts of female servers.

*Id.* at ¶¶ 15-18. Another busboy named Alex would try to hug her, and one time attempted to look up her skirt while she stood at the cash register. *Id.* at ¶¶ 19-20. This conduct often occurred in front of the managers, but it was ignored. *Id.* at ¶ 23.

Working at Colony Diner made Swinerton anxious and feel alone. *Id*. at ¶¶ 27-30. Before a shift she would have trouble sleeping, and after a shift she would have a hard time calming herself down and would be more irritable. *Id*. at ¶ 30.

### I.   Paula Schuricht

Paula Schuricht worked at Colony Diner as a waitress from November of 2018 to November 2019. Schuricht Decl. ¶ 3. Schuricht noticed that George Strifas would make constant sexual comments about female employees and customers. *Id.* at ¶ 5. He would comment about women's clothing and cleavage and make disparaging remarks if they were not wearing makeup or if they did not look good to him. *Id.* at ¶¶ 5-6.

If a waitress flirted with George Strifas or reacted to his harassment positively, he would also favor them with table assignments. *Id.* at ¶ 8. However, if they did not play along with his unwanted sexual banter, he would scream at them. *Id.* ¶ 9. That is what happened to Schuricht. *Id.* ¶¶ 6, 9. Even so, George Strifas regularly gave better tables to the male employees and never screamed at them. *Id.* at ¶ 10. He also encouraged the male employees to treat women the same way he did—often talking to women in a derogatory manner. *Id.* at ¶ 10. Ultimately, Schuricht quit working at the diner because the environment was toxic and was not worth the disrespect she experienced. *Id.* at ¶¶ 12-14.

### J.   Jessica Costa

Jessica Costa worked at Colony Diner as a waitress from 2016-2017. Costa Decl. ¶ 3. George Strifas ogled her immediately after her interview and she could overhear him tell

someone on the phone "you should see the ass on this one that [we] just hired." *Id.* at ¶ 5. George Strifas would constantly leer at her and hit on her saying that he thought she was "sexy" or that "you know you got it going on." *Id.* at ¶ 8. He would comment on her romantic relationships, made sexual inquiries, and press his genital area against her. *Id.* at ¶¶ 9, 11. If she did not play along George Strifas would get angry and scream at her using foul language, often in front of customers. *Id.* at ¶ 10.

Costa witnessed George Strifas prey on the younger staff, who were constantly distressed and nearly in tears after interacting with him. *Id.* at ¶ 12. One young woman, Amanda, complained to her about George Strifas, saying that he had reached his hand up her skirt and touched her vagina and another time had tried to kiss her. *Id.* at ¶ 13.

In order to protect her from George Strifas' unwanted advances, Costa's boyfriend began picking her up from work. *Id.* at ¶ 15. As result George Strifas fired her. *Id.*

## II.       LEGAL STANDARD FOR ENTRY OF DEFAULT JUDGMENT

"Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment." *Priestley v. Headminder*, 647 F.3d 497, 504 (2d Cir. 2011). First, the party must secure a Clerk's Entry of Default because the opposing party has "failed to plead or otherwise defend." Fed. R. Civ. P. 55(a). Where, as here, a corporate defendant fails to appear by counsel, that standard is met and entry of default is appropriate. *See Eagle Assocs. v. Bank of Montreal*, 926 F.2d 1305, 1310 (2d Cir. 1991).

Once a default is obtained from the clerk of the court, the party may apply to the Court for a default judgment. Fed. R. Civ. P. 55(b)(2); *see Priestley*, 647 F.3d at 505. "A defendant's default is an admission of all well-pleaded factual allegations in the complaint except those relating to damages." *Lyons P'ship, L.P. v. D & L Amusement & Ent., Inc.*, 702 F. Supp. 2d

104, 111 (E.D.N.Y. 2010). After the default all that "remains for the court to consider [is] whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." *Id.* Ultimately, "[t]he decision whether to enter default judgment is committed to the district court's discretion." *Greathouse v. JHS Sec.*, 784 F.3d 105, 116 (2d Cir. 2015).

The court must then determine the nature and amount of damages. "[I]t is not necessary for the District Court to hold a hearing, as long as it ensured that there was a basis for the damages specified in the default judgment." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997); *Maslowski v. Crimson Const. Corp.*, No. CV 11-556 VVP, 2013 WL 752199, at *6 (E.D.N.Y. Feb. 27, 2013). The court "can rely on detailed affidavits or documentary evidence . . ." to evaluate the proposed damages. *Fustok v Conticommodity Servs., Inc.*, 873 F2d 38, 40 (2d Cir 1989).

## III.    ARGUMENT

### A.    The Well-Pled Allegations in the Complaint Provide a Sufficient Basis For Entry of Default Judgment Against Defendant.

The well-pled allegations in the Complaint are more than sufficient to establish Defendant's liability. Title VII bars employers from creating or maintaining a hostile work environment based on sex, or conditioning employment opportunities on an employee's acquiescence to sexual advances. 42 U.S.C. § 2000e–2(a)(1); *see Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations and quotations omitted). To prevail on a harassment claim, a plaintiff must show "(1) that the

harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009).

A plaintiff need not show that her hostile working environment was both severe and pervasive; they only need to demonstrate that the harassment was sufficiently severe or sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions." *Pucino v. Verizon Wireless Communs.*, 618 F.3d 112, 119 (2d Cir. 2010).

1.  The Harassment was Sufficiently Severe or Pervasive to Create a Hostile Work Environment.

Here, the Complaint establishes that Defendant's conduct was sufficiently severe or pervasive to alter the conditions of Claimants' employment. "[T]he test is whether 'the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse*.'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003). Moreover, "[b]ecause the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim." *Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 570 (2d Cir. 2000). The Complaint alleges, and the declarations demonstrate, that all of the women who worked at Colony Diner were subjected to a work environment in which they were constantly sexualized and ridiculed because they were women.  Compl. ¶¶ 21-22; Fuertes Decl. ¶¶ 6, 12; Rondeau Decl. ¶¶ 12, 18; Maiorano Decl. ¶¶ 11-13; Schuricht Decl. ¶ 9; Swenson Decl. ¶ 10; Swinerton Decl. ¶ ¶ 7- 10.

The Complaint further alleges, and the declarations demonstrate, that female

14

employees were subjected to unwanted physical contact by George Strifas, and other male employees on several occasions, including sexual assaults. Compl. ¶¶21, 23; Benitez-Roa Decl. ¶¶ 14, 16-18; Fuertes Decl. ¶ 3; Maiorano Decl. ¶ 13; Rondeau Decl. ¶ 11; Escorza Decl. ¶ 16; Cosgrove Decl. ¶ 9. The persistent and unwelcome physical contact created a hostile and abusive work environment for Claimants. *See EEOC v. Suffolk Laundry Servs.*, 48 F. Supp. 3d 497, 514- 15 (E.D.N.Y. 2014) (recurring nature of unwanted physical contact and observations of harasser engaging in similar harassment of other female employees sufficiently pervasive to alter employee's working conditions); *see generally Sowemimo v. D.A.O.R. Sec.*, 43 F. Supp. 2d 477, 484 (S.D.N.Y. 1999) ("[T]he law . . . deems unwanted touching to be a highly significant factor contributing to a hostile work environment.").

In addition to unwelcome physical contact, the Complaint alleges that George Strifas and other male employees propositioned female employees, including explicit requests for sex, and routinely made sexually suggestive remarks. Compl. ¶¶ 22, 23; Fuertes Decl. ¶ 5; Rondeau Decl. ¶¶7-10; Maiorano Decl. ¶¶ 8-10; Benitez-Roa Decl. ¶¶ 8-9; Escorza Decl. ¶¶ 5-7; Swenson Decl. ¶ 8; Schuricht Decl. ¶ 5; Cosgrove ¶ 8. These sexual advances and lewd comments also contributed to the sexually hostile work environment for Claimants. *See, e.g., Guzman v. News Corp.*, No. 09 CIV. 09323 LGS, 2013 WL 5807058, at *3 (S.D.N.Y. Oct. 28, 2013) (plaintiff alleged that the harasser commented on her appearance, leered at her, and inappropriately touched and made lewd remarks to a female colleague); *Messer v. Fahnestock & Co.*, No. 103CV-04989-ENV-JMA, 2008 WL 4934608, at *3, 15 (E.D.N.Y. Nov. 18, 2008) (plaintiff alleged that her harasser "massaged her shoulders without permission, told her on one occasion that she 'loo[ked] very sexy,'" and commented on her appearance and personal life despite indications from plaintiff that his comments and attention were unwelcome).

15

1.  <u>Defendant is Liable for the Harassing Conduct of its Owners and its Non-Supervisory Employees.</u>

Defendant is liable for the harassing conduct of its owners, George and Thomas Strifas, and the male busboys, servers and other employees who harassed female employees at Colony Diner. As owners and operators of Colony Diner, George and Thomas Strifas are Defendant's alter ego and thus their conduct making sexual comments and touching female employees is automatically imputed to Defendant. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 789-90 (1998) (employer is strictly liable where the individual responsible for creating the hostile work environment is a corporate "proxy" or "alter ego," which includes owners); *Townsend v. Benjamin Enter.*, 679 F.3d 41, 52-53 (2d Cir. 2012) (presidents and owners are an employer's proxy or alter ego).

Defendant is also liable for the harassing conduct of its staff members, including male busboys and waiters, because George and Thomas Strifas witnessed the harassment and did nothing to prevent it. When "the harasser is the victim's co-worker, the employer will be liable if it is negligent, that is, if it either 'provided no reasonable avenue for complaint or *knew of the harassment but did nothing about it*.'" *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 441 (2d Cir. 1999) (emphasis added); *Duch*, 588 F.3d at 762 (2d Cir. 2009) (holding that an employer is liable for harassment by coworker when plaintiff demonstrates that "it failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.")(internal quotations omitted).

The Complaint, as well as the declarations submitted with this motion, demonstrate that Defendant was negligent in preventing waiters and busboys from harassing the Claimants. Its owners were aware of and witnessed repeated sexual and unwelcome comments and

inappropriate touching from male employees to female employees and failed to take any effective remedial action. Compl ¶ 23; Rondeau Decl ¶ 22; Swinerton ¶ 23; Escorza ¶ 27, 30; Maiorano Decl. ¶ 21. Indeed, there were several instances in which the owners, upon witnessing the harassment, just laughed and dismissed the behavior. *E.g.* Rondeau Decl. ¶ 22.

      2.  <u>Defendant Constructively Discharged Julia Rondeau by Creating and Maintaining an Intolerable Hostile Work Environment.</u>

The Complaint alleges that Defendant's hostile work environment resulted in, among other things, the constructive discharge of certain female employees. Compl. ¶ 20. Sexual harassment rises to the level of a constructive discharge when the harassment creates "working conditions so intolerable that a reasonable person would have felt compelled to resign." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 147 (2004). The Complaint's allegations of the hostile work environment created by Defendant, *supra*, further support the constructive discharge claims on behalf of Julia Rondeau. *See, e.g., Notaro v. Fossil Indus., Inc.*, 820 F. Supp. 2d 452, 459 (E.D.N.Y. 2011) (holding that  supervisor frequently yelling at plaintiffs and using obscenities could support constructive discharge claim); *Fitzgerald v. Henderson*, 251 F.3d 367-68 (2d Cir. 2001) (reversing the district court's summary judgment on constructive discharge claim where plaintiff presented evidence of repeated unwanted sexual statements by her supervisor, followed by increasingly hostile verbal criticism of her work after she resisted the advances). Rondeau endured constant groping and unwanted sexual contact at work, as well as George Strifas' sexist outbursts and constant misogyny. Any reasonable person would have found such working conditions intolerable and left.

**B.** **The Claimants' Declarations Establish an Appropriate Basis to Award the Maximum Amount of Monetary Damages Allowed Under Title VII for an Employer This Size.**

A Title VII claimant may recover compensatory damages to redress "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses." 42 U.S.C. § 1981a(b)(3); *see Bergerson v. New York State Office of Mental Health*, 652 F.3d 277, 286 (2d Cir. 2011). The maximum amount of compensatory and punitive damages in this case, with an employer with more than fifteen but fewer than one-hundred employees, is limited to $50,000 per Claimant. *see* Compl. ¶ 4; Ans. ¶ 4; Riccardi Decl. ¶ 5; 42 U.S.C. § 1981a. The EEOC requests the Court to award the statutory cap per Claimant.

In the Second Circuit, emotional distress claims are often grouped into three categories with corresponding ranges of monetary awards for compensatory damages. *See, e.g. Olsen v. Cnty. Of Nassau*, 615 F. Supp. 2d 35, 46–47 (E.D.N.Y. 2009) (holding that emotional distress claims can be categorized as "garden variety," significant, or "egregious"). As set forth more fully below, even if this Court were to conclude that each Claimant's emotional distress only warranted the least severe category, or so-called "garden-variety" emotion distress, the statutory cap of $50,000 in this case is on the lower range of monetary awards.[1] *E.g. id.* Moreover, there is sufficient evidence that Defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual," to support an award of punitive damages. 42 U.S.C. § 1981a(b)(1). As such, each Claimant should be entitled to the maximum amount of compensatory and punitive damages.[2]

---

[1] Although the present analysis focuses on "garden variety" emotional distress due to the monetary cap of Title VII, the offending behavior and the resulting emotional distress of the Claimants far exceeds the type that justifies awards of compensatory damages of only $50,000.

[2] Section 1981a's limitation on damages means that no Claimant can receive more than $50,000 in total compensatory and punitive damages. However, should the Court decline to award any Claimant the full $50,000 in compensatory damages, the Court should make up the shortfall with an award of punitive damages if they are deemed warranted.

In addition, Julia Rondeau was constructively discharged. Therefore, she should be awarded backpay with prejudgment.

      1.   <u>The Claimants Should Each Be Awarded Compensatory Damages of $50,000</u>

"[F]ederal law does not require a discrimination victim to show either (1) physical manifestations of emotional distress or (2) that he or she sought medical treatment for the emotional injury." *United States v. City of New York*, 897 F. Supp. 2d 30, 43 (E.D.N.Y. 2012). A plaintiff's testimony of emotional injury may be "substantiated by other evidence that such an injury occurred, such as the testimony of witnesses to the plaintiff's distress. . . , *or the objective circumstances of the violation itself*." *Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002) (emphasis added); *see Dotson v. City of Syracuse*, No. 5:04-CV-1388 NAM/GJD, 2011 WL 817499, at *14 (N.D.N.Y. Mar. 2, 2011), *aff'd*, 549 F. App'x 6 (2d Cir. 2013) (in evaluating damage awards, "courts should compare not only the plaintiff's injuries in similar cases, but also the severity of the adverse action").

So-called "garden variety" claims are where "the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms, and fails to relate the severity or consequences of the injury." *Olsen*, 615 F. Supp. 2d 35, 46–47 (E.D.N.Y. 2009). Although there is no exact science to determine emotional distress damages, the Second Circuit has found that awards of over $100,000 for "garden variety" emotional distress are not unreasonable. *See Meacham v. Knolls Atomic Power Lab.*, 381 F.3d 56, 77–78 (2d Cir. 2004), *vacated on other grounds sub nom. KAPL, Inc. v. Meacham*, 544 U.S. 957 (2005) (finding that $125,000 award for "subjective distress" not accompanied by medical treatment did not materially deviate from a reasonable award); *Patterson v. Balsamico*, 440 F.3d 104, 120 (2d Cir. 2006) (finding that $100,000 verdict for "garden variety" emotional distress did not

materially deviate from reasonable compensation).

Emotional distress damage awards in employment discrimination cases for so-called "garden variety" emotional distress damages in the Second Circuit "range from around $30,000 to $125,000." *Watson v. E.S. Sutton, Inc.*, No. 02 CIV. 2739, 2005 WL 2170659, at *16 (S.D.N.Y. Sept. 6, 2005), *aff'd,* 225 F. App'x 3 (2d Cir. 2006); *see also Quinby v. WestLB AG,* No. 04 CIV.7406 WHP, 2008 WL 3826695, at *3 (S.D.N.Y. 2008) ("'Garden variety' emotional distress claims lacking extraordinary circumstances and without medical corroboration generally merit $30,000 to $125,000 awards."); *Olsen,* 615 F. Supp. 2d at 47 (E.D.N.Y. 2009) (same); *DeCurtis v. Upward Bound Int'l, Inc*., No. 09 CIV. 5378 RJS, 2011 WL 4549412, at *4 (S.D.N.Y. 2011) (awarding plaintiff $100,000 in compensatory damages in a default judgment where plaintiff testified to being stressed, losing sleep, dreading going into work and interacting with her supervisor, following several incidents of sexual harassment).

Moreover, the Second Circuit has instructed that when evaluating comparable awards for compensatory damages, the passage of time since the awards were made should be considered to ensure an accurate comparison. *See Meacham* 381 F.3d at 78 ("In addition, the passage of time since the cited cases were decided could reasonably support higher verdicts."). Therefore, the established range of $30,000-$125,000 in damages for "garden variety" emotional distress as set forth in *Watson* should be adjusted for inflation to ensure an accurate comparison. *See* 2005 WL 2170659 at *16. Adjusting for inflation, "garden variety" emotional distress supports an award of damages from $45,548.69 to $189,786.22 in today's dollars.[3] Thus, a compensatory damage award of $50,000 per Claimant is firmly supported by Second Circuit precedents.

---

[3] These amounts were calculated using the United States Bureau of Labor Statistics Consumer Price Index Calculator, *available at* https://www.bls.gov/data/inflation_calculator.htm (last checked April 28, 2023) using September 2005, when *Watson* was decided as a starting point.

2.  <u>The Evidence Easily Supports an Award of $50,000 for Each Claimant</u>

The Claimants were subjected to unwelcome sexual advances, constant unwelcome physical touching and, in some cases, sexual assault. They were all constantly subjected to a steady barrage of crude sexual comments and abuse from their employers because they were women and were treated worse than the men with whom they worked. The offending behavior and the resulting emotional distress of each Claimant meets or exceeds the standard for recovery of $50,000. *See Cross v. New York City Transit Auth.*, 417 F.3d 241, 258-59 (2d Cir. 2005) (affirming $50,000 award where plaintiffs experienced "anger," "humiliation," and "frustration" at their demotions, but did not seek medical treatment); *Equal. Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, No. 14-CV-3673 (KAM)(JO), 2020 WL 1083771, at *14 (E.D.N.Y. Mar. 6, 2020) (upholding $50,000 awards in religious discrimination case where the victims testified that they felt "uncomfortable," "offended," "taken aback," and "vulnerable" as a result of workplace religious practices); *Perdue v. City Univ.*, 13 F. Supp. 2d 326, 337 (E.D.N.Y. 1998) (affirming award of $85,000 in employment discrimination case based on plaintiff's testimony that she felt "disgraced, embarrassed, scared," "not equal," and  "disrespected"); *see generally Patrolmen's*, 310 F.3d at 56 (finding the jury's award of $50,000 per plaintiff to be "well within the range of acceptable awards for emotional distress in civil rights case").

As described in more detail in their declarations, the Claimants' emotional distress included the following:

- **Anny Benitez-Roa,** a teenager, was subjected to unwelcome sexual advances, nonconsensual physical touching by her boss and various coworkers, and was sexually assaulted by George Strifas. Benitez-Roa Decl. ¶¶ 14-22, 25.  Benitez-Roa suffered from severe depression, withdrew from friends, suffered persistent feelings of dread, and lost

21

weight despite being pregnant. *Id* at ¶¶ 29-32.

- **Julia Rondeau**, a college sophomore working her first restaurant job in New York, was subjected to constant unwanted intimate contact, a steady barrage of sexual comments by her boss, and excessive focus on her body and the bodies of other women at the diner.[4] Rondeau Decl. ¶¶ 10-26. This hostile work environment caused her severe anxiety, panic attacks, depression, and reactivated her eating disorder. *Id*. at ¶ 31.

- **Alyssa Cosgrove**, a teenager, was subjected to constant sexual comments about her body and touching in a sexual manner from George Strifas for years and she watched him grope and abuse her teenaged co-worker. Cosgrove Decl. at ¶¶ 7-12. This caused her significant anxiety, specifically around her body image, depression, and withdrawal from friends and family. *Id.* at ¶¶14-15.

- **Natalie Escorza**, a teenager, suffered constant sexual harassment from George Strifas, older busboys, and waitstaff. Escorza Decl. at ¶¶ 6-17, 21-35. They would constantly comment on her body, subject her to constant sexual come-ons and touch her intimately without her consent. *See Id.* Escorza suffered from severe anxiety, her personality changed*,* she lost weight, and she sought treatment from a therapist. *Id*. at ¶ 39.

- **Donna Maiorano** worked at Colony Diner for years and was constantly objectified and denigrated. Maiorano Decl. ¶¶ 5-20. George Strifas would show her pornography and she

---

[4] Although Rondeau began working for Defendant prior to May 12, 2015, the date 300 days before the charges in this Title VII case were filed, she can recovery for all of the harassment that she suffered between when she began working at Defendant and when she quit in August 2015 under the continuing violation theory. See *Dash v. Bd. of Educ. of City Sch. Dist. of New York*, 238 F. Supp. 3d 375, 389 (E.D.N.Y. 2017) ("Because some of the events plaintiff pleads . . .took place after February 2013 and are part of a continuing violation, plaintiff may proceed with a hostile work environment claim, regardless of whether the acts complained of occurred before or after February 13, 2013.") Under the continuing violation theory, "the incidents constituting a hostile work environment are part of one unlawful employment practice," and therefore "[a defendant] may be liable for all actions that are part of [a] single claim," provided that one act within the claim is timely." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, (2002).

was constantly subjected to unwanted physical contact. *Id.* Being subjected to this behavior humiliated her and she dreaded her time at the Diner. The constant harassment was a constant source of frustration and humiliation leading to depression and trouble sleeping. *Id.* at ¶¶ 24-26.

- **Christina Swenson** worked at Colony Diner for years. Thomas Strifas would humiliate her by trying to show her his erect penis, she was subjected to degrading sexual inquiries, and she observed her co-worker sexually abused and humiliated. Swenson Decl. at ¶¶ 6-16. Swenson became depressed, had trouble sleeping, suffered from nausea and stomach pains, and lost fifteen pounds while working at Colony Diner. *Id.* at ¶¶ 19-22.

- **Jelyssa Fuertes**, a teenager, was subjected to unwanted sexual advances and physical contact from George.  Fuertes Decl. at ¶¶ 3, 5-10, 12-13. The harassment was exhausting, but she was compelled to work in that kind of environment to make money. *Id.* at ¶ 18. Fuertes continued to feel self-conscious about her appearance for a long time and lost her confidence and self-respect, feeling ashamed for putting up with such an abusive environment. *Id.* at ¶ 19.

- **Page Swinerton**, a young college student, was subjected to constant unwanted sexual advances and intimate contact from older busboys, often in front of her managers, on almost every shift. Swinerton Decl. ¶¶ 14-22. Additionally, she endured George and Thomas Strifas' constant comments about her body and their denigration of women and disparate treatment of their female staff. *Id.* at ¶¶ 7-11. This behavior caused Ms. Swinerton severe anxiety, interfering with her ability to sleep. *Id.* at ¶¶ 27-31

- **Paula Schuricht** was subjected to constant unwanted sexual comments from George Strifas who would scream at her mercilessly if he did not like her appearance. Schuricht

23

Decl. ¶¶ 5-10.  She was constantly disrespected because she was a woman, subjected to derogatory comments from her male co-workers, and given worse sections than them. *Id.* at ¶¶ 10-13

- **Jessica Costa** was subjected to constant unwanted sexual comments and contact from George Strifas, who would scream at her if she did not acquiesce. Costa Decl. ¶¶ 5-11. The humiliation abuse she suffered at the hands of George Strifas gave her flashbacks of the sexual abuse she had suffered as a child and teenager. *Id.* ¶¶ 18-20. She grew depressed and sought treatment from a psychiatrist. *Id.* at 21.

The emotional distress the described in the Claimants' declarations support compensatory damage awards of $50,000 per Claimant.

   3.   <u>The Court Should Award Punitive Damages Because George and Thomas Strifas' Conduct was Egregious and Done in Reckless Indifference to their Employees' Federally Protected Rights</u>

Title VII provides for punitive damages where the defendant acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." § 1981a(b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999). To be liable for punitive damages, a plaintiff need only show that the employer discriminated in the face of a "perceived risk" that its actions may violate federal law. *Id.* at 536. Of course, "egregious or outrageous acts" may also support an inference of the requisite "evil motive." *Id.* at 538. The purpose of a punitive damage award is "to punish the defendant and to deter him and others from similar conduct in the future." *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992). Thus, they are not related to the damages suffered by the plaintiff and may be awarded even in the absence of compensatory

24

damages. *Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 358 (2d Cir. 2001). Punitive damages are available in a default judgment and are amply supported here. *See Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 101 (E.D.N.Y. 2020).

Additionally, punitive damages are particularly appropriate where it can be established that the business owner "subjected plaintiffs to repeated sexual comments, inappropriate physical touching, [and] direct requests for sexual contact" *See Bennett v. Luigi's Italian Rest.*, No. 18-1295-JTM, 2020 WL 1503472, at *7 (D. Kan. Mar. 30, 2020); *EEOC v. Pac. Fun Enterprises*, No. CV17-00482ACK-RT, 2020 WL 406681, at *12 (D. Haw. Jan. 7, 2020), *rep. & recomm. adopted*, 2020 WL 406372 (D. Haw. Jan. 23, 2020) (awarding punitive damages where "[d]efendant's owner was directly responsible for inflicting and condoning the sexual harassment"); *EEOC v. Scolari Warehouse Mkts.*, 488 F. Supp. 2d 1117, 1146-47 (D. Nev. 2007) (store owners' participation in sexual harassment supported claim for punitive damages).

Here, Defendant's conduct demonstrates the "malice" necessary to support an award of punitive damages. As described in more detail above, George and Thomas Strifas used their positions as owners of Colony Diner to exploit and prey upon women who relied on them for a paycheck. They subjected them to unwanted sexual advances, unwanted physical contact, and even sexual assault.

Moreover, Defendant was recklessly indifferent to the fact that its conduct violated federal law. George Strifas ridiculed the possibility of a lawsuit rather than take his employees' complaints seriously. Swenson Decl. ¶ 17; Rondeau Decl. ¶ 28. Critically, he continued and allowed this egregious behavior long after the instant EEOC charges were filed in 2016, , *see* Benitez-Roa Decl. ¶¶ 3, 20; Cosgrove Decl. ¶ 4, and after this lawsuit began. Escorza Decl. ¶ 3. "[R]ecklessness and malice are to be inferred when a manager responsible for setting or

enforcing policy . . . does not respond to complaints, despite knowledge of serious harassment." *Deters v. Equifax*, 202 F.3d 1262, 1269 (10th Cir. 2000). Thus, in light of the persistent and reprehensible nature of George's misconduct, his continual targeting of vulnerable employees, and his clear knowledge that his and others' conduct violated the law, the EEOC seeks punitive damages in the amount of $50,000—the statutory cap—for each Claimant.

    4.  <u>The Court Should Award Julia Rondeau Backpay and Pre-Judgment Interest</u>

Because Julia Rondeau was constructively discharged, she should be awarded backpay. "An award of backpay is the rule, not the exception[,]" and is awarded to make a victim of discrimination whole. *Carrero v. New York City Housing Authority*, 890 F.2d 569, 580 (2d Cir. 1989). "The awarded backpay or lost salary is [] the amount of monies the injured party would have earned but-for the discriminatory conduct." *Lewis v. Am. Sugar Ref., Inc.*, 325 F.Supp.3d 321, 361 (S.D.N.Y. 2018). Any uncertainties in determining backpay should be resolved against the employer. *See Rios v. Enter Ass'n. Steamfitters Local Union 638 of U.A.*, 860 F.2d 1168, 1176 (2d Cir. 1988); *see also Santillan v. Henao*, 822 F. Supp. 2d 284, 293 (E.D.N.Y. 2011) (awarding backpay based on the plaintiff's "sworn declaration containing information as to hours worked and rates of pay based on estimation and recollection," even though the information provided was "general and not detailed").

    Rondeau made approximately $700 dollars a week at Colony Diner. Rondeau Decl. ¶ 4. After quitting the diner, she was unemployed for two months before she found a new job making approximately $155 per week, roughly $545 less than she was making at Colony Diner. Id. at ¶ 32. After leaving that job for another one that paid about the same amount, she continued to work until 2017, when she quit to focus on school. Accordingly, Rondeau

26

should receive $42,660 in backpay.[5]

### C. The Court Should Enter an Injunctive Relief to Prevent Further Harassment at Colony Diner

The Court should enter injunctive relief in the form of the Proposed Order, Riccardi Decl.

Ex. 13, because the threat of continued harassment remains great. Under Title VII, "[i]f the court

finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful

employment practice charged in the complaint, the court may enjoin the respondent from

engaging in such unlawful employment practice, and order such affirmative action as may be

appropriate." 42 U.S.C. § 2000e–5(g)(1). When plaintiffs establish a violation of Title VII,

courts have "… the duty to render a decree which will so far as possible eliminate the

discriminatory effects of the past as well as bar like discrimination in the future." *Albermarle*

*Paper Co. v. Moody*, 422 U.S. 405, 418 (1975)."Once a violation of Title VII has been

established, the district court has broad, albeit not unlimited, power to fashion the relief it

believes appropriate." *Bridgeport Guardians Inc. v. City of Bridgeport*, 933 F.2d 1140, 1149 (2d

Cir.1991). "The bounds of the court's discretion are set by the purposes of Title VII, which are to

prevent discrimination and achieve equal employment opportunity in the future...." *Berkman v.*

*City of New York*, 705 F.2d 584, 594 (2d Cir.1983). The injunctions must, at a minimum, include

prohibitions and affirmative relief "necessary to prevent the recurrence" of the unlawful

harassment. *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 101 (2d Cir. 2012). To assess the propriety

of injunctive relief, the Court must evaluate "the balance of equities and consideration of the

public interest." *Winter v. Nat. Resource Def. Couns*, 555 U.S. 7, 32 (2008).

"Courts will grant injunctive relief against an employer when there is evidence of

---

[5] This amount was calculated by multiplying her $700 by 8 weeks of unemployment followed by multiplying $545 by 68 weeks of underemployment until she quit her job in February 2017 to focus on school.

27

widespread and continuous retaliation or harassment that indicates that the threat of future bad acts is high." *Lewis v. Am. Sugar Ref., Inc.*, No. 14-CV-02302 (CRK), 2018 WL 4179053, at *3 (S.D.N.Y. Aug. 15, 2018); *see also E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 99 (2d Cir. 2012) (holding that it was abuse of discretion to deny injunctive relief when there was a likelihood that harassment would recur). Here, Colony Diner remains open, Riccardi Decl. ¶ 3, and there is no reason to believe that George or Thomas Strifas have changed their ways. The sexual harassment continued even after the EEOC began investigating these allegations in 2016. Accordingly, the proposed injunctive relief is warranted. *See Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 213 (E.D.N.Y. 2018) (finding injunctive relief warranted because of hostile work environment created by CEO and COO of company).

Because Colony Diner is still in operation, Riccardi Decl. ¶ 3, the Court should impose relief in the form of the Proposed Order, attached as Exhibit C to the Riccardi Declaration. The Proposed Order includes specific injunctions against sexual harassment and retaliation and requires the following affirmative relief: 1) the creation and promulgation of a policy against sexual harassment and retaliation that includes a prohibition on George or Thomas Strifas dating their employees or attempting to engage in any romantic or sexual relationship with them; 2) appointing an independent monitor to ensure Defendant's compliance and to receive and investigate complaints of harassment by George or Thomas Strifas; 3) instituting training for all owners, managers, and staff to ensure that they comply with Title VII; 4) providing notice to the employees of the Order and Judgment and their rights under Title VII and the Order in this case; and 5) imposing and obligation to report to the EEOC. Given the egregious behavior by Defendants' owners, these injunctions are necessary to ensure that Defendant no longer subjects its female employees to a hostile work environment

based on their sex.

Specific injunctions prohibiting harassment and retaliation are appropriate when there is a longstanding record of violations of Title VII. *See, e.g. United Health Programs,* 350 F. Supp. 3d at 219. And a term of five years for affirmative injunctive relief is appropriate when there is evidence that a hostile work environment has been maintained for years and there is no evidence that it has ceased. *Id.* at 221 (imposing a five-year term where hostile work environment spanned five years and "there is no way of knowing if the discriminatory practices have ceased.").

Imposing an independent monitor is also warranted. Courts have imposed outside monitors to oversee implementation of court orders where, like here, high level managers are involved in discrimination that extended for many years. *Id.* (appointing outside monitor who could receive and investigate complaints and monitor compliance where senior managers at small company had created hostile work environment based on religion); *see also United States v. City of New York*, 717 F.3d 72, 97 (2d Cir. 2013) (affirming imposition of independent monitor to oversee FDNY's ending of discriminatory hiring and retention policies). Here, the owners of the company are directly involved in the harassment and they have a history of failing to act on complaints and known acts of harassment. Moreover, employees understandably feared complaining about George or Thomas Strifas' behavior given their tempers and history of retaliation. All of these facts argue in favor of imposing an independent monitor that can receive complaints and ensure compliance with the Court's Order. *See United Health Programs*, 350 F.Supp.3d at 221 (noting that an independent monitor was necessary to investigate complaints because the same upper management that engaged in the discimination would have influence over any employee empowered to investigate complaints).

The provisions requiring an anti-harassment policy and training are also justified. An

anti-harassment policy and complaint procedures are generally implemented where harassment has occurred at a company without effective policies. *See, e.g. KarenKim, Inc.*, 698 F.3d at 101 (reversing district court's refusal to order new policies, procedures and trainings); *see also United Health Programs*, 350 F.Supp.3d at. 223 (ordering changes to defendants' EEO policies and complaint procedures).[6] The specific requirements prohibiting George and Thomas Strifas from attempting to any romantic or sexual relationship with their employees is necessary to prevent a recurrence of their predatory sexual behavior. *See, e.g.* Benitez Roa Decl. ¶¶ 20-23.

The posting of a notice ensures that Defendant's current and future employees are aware of their rights under the Order and that they can bring any violations to the attention of the independent monitor or the EEOC. Courts regularly require Defendants to post notices to their employees as part of post judgment injunctive relief. *See United Health Programs*, 350 F. Supp. 3d at 227; *E.E.O.C. v. DCP Midstream*, 608 F.Supp.2d 107, 112 (D. Me.)..

Finally, requiring reporting to the EEOC is also an appropriate means to ensure that Defendant complies with the Court's Order, and the requirements are not onerous. *United Health Programs*, 350 F. Supp. 3d at 228. Thus, mandating the injunctive relief the EEOC has proposed is reasonable as it is tailored to address the sexual harassment at Colony Diner.

## CONCLUSION

For the foregoing reasons, Plaintiff EEOC respectfully requests that the Court enter a final default judgment against Defendant and award monetary damages based on the well-pled allegations of the Complaint and the Declarations submitted herein and an injunction in the form attached as Riccardi Decl. Ex. 13.

---

[6] The proposed content of the anti-harassment policy and training are largely based on the EEOC's  EEOC Select Task Force on the Study of Harassment in the Workplace: Report of Co-Chairs Chai R. Feldblum & Victoria A. Lipnic, June 2016, *available at* https://www.eeoc.gov/select-task-force-study-harassment-workplace#_Toc453686311 (last checked April 28, 2023).

Dated: April 28, 2023
     New York, NY

Respectfully submitted,


*/s/ Sebastian Riccardi*
SEBASTIAN RICCARDI
Senior Trial Attorney
sebastian.riccardi@eeoc.gov
SHIRA POLIAK
Trial Attorney
Shira.poliak@eeoc.gov
ANNETTE LALIC
Trial Attorney
Annette.lalic@eeoc.gov
U.S. Equal Employment Opportunity Commission
New York District Office
33 Whitehall St., 5th Floor
New York, NY 10004-2112
Telephone No.: 929-506-5340

31