UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

                              Plaintiff,

     v.

STARDUST DINERS, INC. D/B/A
COLONY DINER,

                              Defendant.
----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

21-CV-3122 (ENV) (LGD)

**LEE G. DUNST**, Magistrate Judge:

Presently before the Court is Plaintiff's Motion for Default Judgment at Electronic Case

File Number ("ECF No.") 50.  On May 1, 2023, District Judge Eric N. Vitaliano referred the

Motion for Default Judgment to the undersigned for a Report and Recommendation.  May 1,

2023 Order.  The undersigned respectfully recommends that Plaintiff's Motion for Default

Judgment be granted and the requested relief be granted in part and denied in part.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

On June 2, 2021, Plaintiff United States Equal Employment Opportunity Commission

("EEOC") commenced this action against Defendant Stardust Diners, Inc., doing business as

Colony Diner, pursuant to Title VII of the Civil Rights Act of 1964, on behalf of a group of

Defendant's former employees – Anny Benitez-Roa, Alyssa Cosgrove, Jessica Costa, Natalie

Escorza, Jelyssa Fuertes, Donna Maiorano, Christina Swenson, Page Swinerton, Paula Shuricht,

and Julia Rondeau (the "Claimants").  ECF Nos. 1 & 50.  Specifically, the EEOC alleges that

Defendant discriminated against the female Claimants by subjecting them to a hostile work

environment and tangible employment actions, including constructive discharge or different

terms and conditions of employment, because of their gender.  ECF No. 1 ¶ 20.  The EEOC

further alleges that Defendant retaliated against several of the Claimants because they objected

and/or refused to participate in unlawful sex discrimination.  *Id*. ¶ 24.

After answering the Complaint on September 10, 2021 (ECF No. 13), Defendant

defended itself through the fall of 2022.  However, after its counsel withdrew from the case,

Defendant then failed to appear at pre-trial conferences or respond to several court orders,

despite being explicitly ordered to so on several separate occasions.  ECF Nos. 34, 37, & 42.

The Court provided Defendant with a final warning on October 21, 2022, that "[i]f new counsel

does not appear for the corporate Defendant in this case by [November 14, 2022], a default will

be entered against the Defendant pursuant to Fed. R. Civ. P. 55(a)."  ECF No. 44.  On November

17, 2022, Plaintiff filed a request for a Certificate of Default, which was entered by the Clerk of

Court on December 2, 2022.  ECF Nos. 46 & 47.  On April 28, 2023, Plaintiff filed the Motion

for Default Judgment, pursuant to Federal Rule of Civil Procedure 55(b)(2).  ECF No. 50.

Plaintiff seeks (1) compensatory and punitive damages for the Claimants; (2) injunctive relief,

(3) and back pay with prejudgment interest for Claimant Julia Rondeau.  ECF No. 1 ¶¶ A-H;

ECF No. 50.

A.    **Factual Background**

Since at least May 12, 2015, Defendant allegedly has subjected a class of female

employees to unlawful employment practices at its diner located in East Meadow, New

York.  ECF No. 1 ¶ 20.  Plaintiff contends that the actions of Defendant's owners George

and Thomas Strifas created a hostile work environment based on the gender of their

employees.  *Id*. ¶¶ 20-23.  These actions include, for example, the regular, unwanted, and

non-consensual physical touching, pervasive sexual questioning, and continuous

derogation of Defendant's female employees by George and Thomas Strifas. *Id*. In permitting, condoning, and failing to stop other male employees from emulating the owners' example, Plaintiff argues that Defendant also knew or should have known of the severe or pervasive acts of sexual harassment to which female employees were subjected. *Id*. ¶ 23.

Additionally, Plaintiff contends that when female employees objected to or complained of this behavior, Defendant retaliated by changing their scheduled shifts and assigning them to the least remunerative sections of the restaurant to punish those who did not ultimately acquiesce. *Id*. ¶ 25. Plaintiff claims that these alleged unlawful employment practices were intentional, done with malice or with reckless indifference to the federally protected rights of the women employed by Defendant, injured female employees, and resulted in their harm and suffering. *Id*. ¶¶ 26-28.

These aforementioned facts are taken solely from the Complaint and are accepted as true for purposes of the default judgment motion.[1] Additional facts are set forth in the declarations of the ten Claimants who worked at Defendant and will be used by the Court to determine whether there is an adequate basis for the damages sought by Plaintiff.[2]

---

[1] The Court notes that the declarations submitted in support of the instant motion include additional factual allegations pertaining to liability. However, "[i]n determining whether a plaintiff is entitled to default judgment, the court is 'limited to the non-conclusory, factual allegations' in the complaint." *Antoine v. Brooklyn Maids*, *26 Inc.* 489 F. Supp. 3d 68, 77 (E.D.N.Y. 2020) (quoting *Johannes Baumgartner Wirtschafts-Und Vermogensberatung GmbH v. Salzman*, 969 F. Supp. 2d 278, 287 (E.D.N.Y. 2013)).

[2] Allegations of liability are deemed admitted upon default, while allegations of damages are not admitted automatically. *Antoine*, *26 Inc.* 489 F. Supp. 3d at 90. The court must be able to ascertain the amount of damages sought by a plaintiff before entering judgment in the amount demanded. *See Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989). The Court must be able to ascertain the amount of damages with "reasonable certainty" based upon *inter alia* "detailed affidavits or documentary evidence." *Id.*; *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) ("The district court must . . . conduct an inquiry in order to ascertain the amount of damages with reasonable certainty."); *see also* Fed. R. Civ. P.

### i.    Anny Benitez-Roa

Anny Benitez-Roa began working as a hostess at Colony Diner in the summer of 2018, when she was seventeen years old.  ECF No. 50-5 ¶ 3.  Benitez-Roa consistently experienced sexual harassment that escalated once she turned eighteen and included being sexually assaulted by George Strifas.  *Id*. ¶¶ 7, 12-14, 16-22.  George Strifas made numerous sexual comments about her appearance like "you look really hot" and asking her to show more cleavage at work.  *Id*. ¶ 9, 17.  As soon as Benitez-Roa turned eighteen, George Strifas's conduct escalated.  *Id*. ¶¶ 13-14.  The day that Benitez-Roa turned eighteen he gave her one-hundred dollars and told her to go buy herself something nice.  *Id*. ¶ 13.  Thereafter, George Strifas started to touch her intimately at work, including touching her genitals through her leggings.  *Id*. ¶¶ 14, 16-19.  Then, in late 2020, George Strifas asked Benitez-Roa on a date.  *Id*. ¶ 20.  While on the date, he kissed Benitez-Roa and sexually assaulted her.  *Id*. ¶ 22.  Benitez-Roa was uncomfortable with George Strifas's conduct but did not think she could say anything.  *Id*.  She was pregnant and depended on the income to support herself.  *Id*. ¶ 15.  Benitez-Roa felt that George Strifas targeted her because she was vulnerable because he knew that she was a victim of domestic violence.  *Id*. ¶ 24.  As a result of the harassment, Benitez-Roa became very depressed and lacked the strength to seek help.  *Id*. ¶¶ 29, 31.  She dreaded going to work and felt disgusted with herself for letting George Strifas harass her.  *Id*. ¶ 29.  The stress of the situation caused her to lose weight and strained her friendships.  *Id*. ¶ 31-32.

---

55(b)(2).  In addition, where the damages are "not susceptible to simple mathematical calculation, Federal Rule of Civil Procedure 55(b)(2) gives courts discretion to determine whether an evidentiary hearing is necessary or whether to rely on detailed affidavits or documentary evidence."  *Am. Jewish Comm. v. Berman*, No. 15 Civ. 5983 (LAK) (JLC), 2016 WL 3365313, at *4 (S.D.N.Y. June 15, 2016) (citation omitted).

### ii.   Julia Rondeau

Julia Rondeau began working as a server at the Colony Diner when she was a nineteen-year-old college sophomore; she left in August of 2015, due to the constant and pervasive sexual harassment she endured.  ECF No. 50-6 ¶ 3.  Every shift, either George or Thomas Strifas tried to engage Rondeau in conversations about the appearance of female employees and customers in a sexual or critical manner.  *Id*. ¶¶ 10-16.  They would constantly comment or inquire about her sex life.  *Id*. ¶¶ 16-18.  Rondeau constantly worried that the sexual banter would turn physical.  *Id*. ¶ 20.  George Strifas would often invade her physical space and touch her shoulders.  *Id*. ¶ 11.  One of Rondeau's coworkers, a waitress named Amanda, complained to Rondeau that George Strifas tried to have sex with her in his office.  *Id*. ¶ 20.  Other male employees followed the example set by George Strifas and harassed Rondeau, eventually resulting in her being sexually assaulted by a male server.  *Id*. ¶¶ 21-26.  A busboy would frequently grab her, and she would pull away in obvious discomfort.  *Id*. ¶ 22.  George and Thomas Strifas would witness these incidents and laugh at Rondeau's reaction, which only encouraged the busboy's behavior.  *Id*.  A waiter named Joel would touch her inappropriately and whispered in her ear about her clothing or how attractive she was.  *Id*. ¶ 23.  On multiple occasions Joel would trap her behind the counter and grab her butt.  *Id*. Thomas Strifas witnessed Joel grabbing Rondeau but ignored it.  *Id*. ¶ 25.  One day after work, Joel followed Rondeau home to her sorority house.  *Id*. ¶ 26.  Not knowing what to do, Rondeau invited Joel inside, at which point he sexually assaulted her.  *Id*.  After Rondeau reacted in distress, Joel left.  *Id*.  The harassment at Colony Diner caused Rondeau to experience severe anxiety, including panic attacks, and caused her eating

disorder to return. *Id*. ¶¶ 30-31. Because she could not tolerate the harassment anymore, Rondeau quit in August 2015. *Id*. ¶ 32. However, her experience at Colony Diner was scarring and still impacts her subsequent employment. *Id*. ¶ 33

### iii. Natalie Escorza

Natalie Escorza started working at Colony Diner as a hostess in November of 2019, when she was seventeen, and continued to work there until June of 2021. ECF No. 50-7 ¶ 3. George Strifas would constantly comment on her body, encourage her to wear tight clothing, and ogle her. *Id*. ¶¶ 6-7, 9-10. He also constantly asked her about her sex life. *Id*. ¶¶ 12-13. Busboys and kitchen staff followed George Strifas's example by constantly objectifying Escorza. *Id*. ¶¶ 24-35. George Strifas also would touch Escorza in intimate ways without her consent. *Id*. ¶¶ 14, 16. For example, Escorza was at the cash register leaning over with her forearms on the counter when George Strifas sexually assaulted her. *Id*. ¶ 14. After that, George Strifas would regularly caress her shoulders, place his hands on both sides of her waist, and touch her back. *Id*. ¶ 16. Again, the male employees at Colony Diner followed George Strifas' lead. *Id*. ¶¶ 21-35. Multiple times a shift, Pedro, a busboy, would try to grab her, make sexual comments about her body, and proposition her for sex. *Id*. ¶¶ 21-31. A manager witnessed some of these interactions, but just laughed. *Id*. ¶ 30. Escorza told Thomas Strifas about the harassment, but he failed to do anything. *Id*. ¶ 27. A server would also proposition her and attempt to hug her. *Id*. ¶¶ 31-32. The harassment by George Strifas triggered memories of sexual assaults that she had suffered in the past. *Id*. ¶ 19. Because of her experience, Escorza lost a noticeable amount of weight, became more anxious, and had less energy. *Id*. ¶¶ 36-38.

### iv.   Alyssa Cosgrove

Alyssa Cosgrove began working as a hostess at Colony Diner in June 2017, when she was a seventeen-year-old high school senior, and she worked there until December 2019.  ECF No. 50-8 ¶¶ 3-4.  George Strifas approached her while she was a customer at the diner, told her she was beautiful, and asked her to work with him.  *Id.* ¶ 3.  George Strifas would constantly comment on her body and encourage her to wear more revealing clothes.  *Id.* ¶ 8.  He would ask her if she had a boyfriend and tell her he would love to take her out.  *Id.*  George Strifas also would constantly touch her in an intimate and inappropriate manner while at work.  *Id.* ¶ 9.  Cosgrove was afraid to tell George Strifas to stop because he was known to have a volatile temper and she had been retaliated against by his cousin Thomas Strifas for complaints in the past.  *Id.* ¶¶ 9, 11.  Instead, she would try to move away or pretend to need a bathroom break.  *Id.* ¶ 9.  Cosgrove also was grabbed and harassed by a busboy named Pedro.  *Id.* ¶ 12.  Pedro would reach out and caress her back whenever she would pass him and often tried to put his arm around her waist.  *Id.*  He also would make sexual comments to her and sent her sexually explicit messages on social media.  *Id.*  Cosgrove also witnessed George Strifas repeatedly sexually molest another teenager, Anny Benitez-Roa.  *Id.* ¶ 10.  Cosgrove would watch as George Strifas would touch and caress Benitez-Roa and would hear him tell her that he wanted to have sex with her in the back of the diner.  *Id.*  As a result of the sexualized environment, Cosgrove started to become anxious about her appearance and developed an unhealthy obsession about how she looked.  *Id.* ¶ 13.  She felt embarrassed, depressed, and anxious about the sexual harassment she had to endure and withdrew from her family until she quit in 2019.  *Id.* ¶¶ 14-15.

### v.    Donna Maiorano

Donna Maiorano was a waitress at Colony Diner for many years before quitting in 2018.  ECF No. 50-9 ¶ 3.  George Strifas would constantly try and engage Maiorano in unwanted sexual banter; he would show her pornography on his phone and make crude inquiries about her sex life.  *Id*. ¶¶ 8, 12-13, 15.  He would sometimes grab her neck and hair.  *Id*. ¶ 14.  Maiorano also was subjected to unwanted attention from a waiter, Joel, who would constantly proposition her for dates and "rub against" her without her permission.  *Id*. ¶¶ 19-20.  Despite Maiorano's apparent discomfort, neither George nor Thomas Strifas would do anything to discourage it.  *Id*. ¶ 21.  Instead, they would just make jokes with Joel, leading to his continued behavior.  *Id*.  Maiorano also witnessed George Strifas preying on hostesses, some of whom were teenagers.  *Id*. ¶ 8.  The constant abuse, unwelcome physical contact, and intrusive crude sexual questions disgusted Maiorano, but she felt compelled to tolerate it since pushing back would lead to retaliation.  *Id*. ¶ 16.  Eventually she quit.  *Id*. ¶ 27.

### vi.    Christina Swenson

Christina Swenson worked as a waitress at Colony Diner for roughly two years.  ECF No. 50-10 ¶ 3.  While she was there, she was subjected to constant harassment by George and Thomas Strifas.  *Id*. ¶¶ 7-10.  They would frequently make crude inquiries into her sex life, constantly comment on her body, and show extreme favoritism towards the male staff.  *Id*. ¶¶ 8-10, 12, 14, 16.  Every conversation or interaction was steered towards sex, often in the crudest ways.  *Id*. ¶ 10.  If she objected to their sexist behavior, or refused to play along, they would retaliate against her by giving her fewer tables or a worse section to wait on, thereby reducing her income.  *Id*. ¶¶ 11, 19.  In addition, she

witnessed George Strifas' harassment of a fellow waitress, Amanda, whom George Strifas would coerce into performing oral sex on him in his basement office and ridicule in front of the rest of the staff. *Id*. ¶ 6. Furthermore, George Strifas would constantly maneuver to get Swenson alone with him. *Id*. ¶ 13. The constant abuse from George and Thomas Strifas caused her severe emotional distress and humiliation. *Id*. ¶ 18. While working at the diner, Swenson developed stomach issues and lost fifteen pounds. *Id*. ¶ 20.

### vii.   Jelyssa Fuertes

Jelyssa Fuertes started working as a hostess at Colony Diner in the fall of 2011 when she was a freshman in college and needed a job. ECF No. 50-11 ¶ 3. During her time working at Colony Diner, George Strifas constantly tried to touch her and would regularly make inappropriate comments. *Id*. ¶ 6. George Strifas would ask her to pick up menus so he could watch her. *Id*. When she worked in the cash area, he would open the cash register to make the area tighter and then move his body between Fuertes and the backbar to touch her body. *Id*. ¶ 7. On multiple occasions, George Strifas asked for inappropriate sexual photos of her and a high school friend of hers whom George was dating and who also worked at the Diner. *Id*. ¶ 9. The last straw for Fuertes came in 2016 when she was sitting with George in a diner booth discussing an issue with her taxes when he reached over and grabbed her thigh. *Id*. ¶ 5. Because of her experience at Colony Diner, Fuertes lost her self-confidence, constantly worried about her appearance, and felt ashamed. *Id*. ¶¶ 19-20.

### viii.    Page Swinerton

Page Swinerton worked at Colony Diner as a hostess while she was in school, from March 2021 to June 2021.  ECF No. 50-12 ¶ 3.  Thomas Strifas would constantly stare at her body, making her uncomfortable.  *Id*. ¶¶ 7, 9, 10.  The busboys also would show Thomas Strifas pictures of women on their phone – which Swinerton could see – while making sexual comments.  *Id*. ¶ 11.  Swinerton also was harassed by several busboys.  *Id*. ¶¶ 14-21.  Pedro, a busboy, often leered at Swinerton, and he would regularly touch the waists, backs, and butts of female servers.  *Id*. ¶¶ 15-18.  Another busboy named Alex would try to hug her, and one time attempted to look up her skirt while she stood at the cash register.  *Id*. ¶¶ 19-20.  This conduct often occurred in front of the managers, but it was ignored.  *Id*. ¶ 23.  Working at Colony Diner made Swinerton feel anxious and alone.  *Id*. ¶¶ 27-30.  Before a shift she would have trouble sleeping, and after a shift she would have a hard time calming herself down.  *Id*. ¶ 30.

### ix.    Paula Schuricht

Paula Schuricht worked at Colony Diner as a waitress from November of 2018 to November 2019.  ECF No. 50-13 ¶ 3.  Schuricht noticed that George Strifas would make constant sexual comments about female employees and customers.  *Id*. ¶ 5.  He would comment on women's clothing and bodies and make disparaging remarks if they were not wearing makeup or if they did not look good to him.  *Id*. ¶¶ 5-6.  If a waitress flirted with George Strifas or reacted to his harassment positively, he would also favor them with table assignments.  *Id*. ¶ 8.  However, if they did not play along with his unwanted sexual banter, he would scream at them.  *Id*. ¶ 9.  That is what happened to Schuricht.  *Id*. ¶¶ 6, 9.  Even so, George Strifas regularly gave better tables to the male employees and

never screamed at them.  *Id*. ¶ 10.  He also encouraged the male employees to treat women the same way he did—often talking to women in a derogatory manner.  *Id*. ¶ 10.  Ultimately, Schuricht quit working at the diner because the environment was toxic and was not worth the disrespect she experienced.  *Id*. ¶¶ 12-14.

### x.    Jessica Costa

Jessica Costa worked at Colony Diner as a waitress from 2016 to 2017.  ECF No. 50-14 ¶ 3.  George Strifas ogled her immediately after her interview and she could overhear him tell someone on the phone "you should see the ass on this one that [we] just hired."  *Id*. ¶ 5.  George Strifas would constantly leer at her and hit on her saying that he thought she was "sexy."  *Id*. ¶ 8.  He would comment on her romantic relationships, made sexual inquiries, and press his genital area against her.  *Id*. ¶¶ 9, 11.  If she did not play along George Strifas would get angry and scream at her using foul language, often in front of customers.  *Id*. ¶ 10.  Costa witnessed George Strifas prey on the younger staff, who were constantly distressed and nearly in tears after interacting with him.  *Id*. ¶ 12.  One young woman, Amanda, complained to her about George Strifas, saying that he had reached his hand up her skirt and another time had tried to kiss her.  *Id*. ¶ 13.  In order to protect her from George Strifas' unwanted advances, Costa's boyfriend began picking her up from work.  *Id*. ¶ 15.  As result, George Strifas fired her.  *Id*.

### B.    Procedural History

More than thirty days prior to the initiation of this lawsuit, two Colony Diner employees (Erica O'Donnell and Donna Orellana) filed two charges of discrimination with the EEOC (EEOC Charge Nos. 520-2016-01734 and 520-2016-01736), alleging violations of Title VII by Colony Diner.  *See* ECF No. 1 ¶ 6.  Following its investigation, on October 20, 2020, the EEOC

issued a Letter of Determination for both charges to Defendant, "finding reasonable cause to believe that Colony Diner violated Title VII as to the two charging parties and a class of similarly aggrieved female employees." *Id*. ¶¶ 7-8.  The EEOC engaged with Defendant in informal methods of conciliation to endeavor to eliminate its unlawful practices and provide appropriate relief but, was unable to secure from Defendant an agreement acceptable to the EEOC.  ECF No. 1 ¶¶ 9-11, 17, 21.  On February 3, 2021, the EEOC issued to Defendant a Notice of Failure of Conciliation.  ECF No. 1 ¶ 12.  Plaintiff commenced the instant case on June 2, 2021.  ECF No. 1.  In the Complaint, Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and seeks various forms of monetary and injunctive relief.  *Id.* at 1, 8-9.

Defendant filed its answer to the Complaint on September 10, 2021.  ECF No. 13.  Subsequently, the parties engaged in settlement discussions while discovery was stayed.  *See* Apr. 18, 2022 Order; April 28, 2022 Order.  On June 2, 2022, the parties attended an unsuccessful settlement conference with Magistrate Judge Arlene R. Lindsay (to whom the case was then assigned).[3]  ECF No. 22 ("The parties were unable to reach an agreement at this time.").  On July 22, 2022, the Court conducted a status conference during which the parties discussed the status of the case and settlement discussions.  ECF No. 31.  The Court ordered the parties to provide the Court with a further update on status by August 19, 2022 and scheduled the next status conference for September 9, 2022.  *Id.*

On August 19, 2022, defense counsel filed a letter stating an intention to file a motion to withdraw as counsel due to "a breakdown in communications with Defendant and Defendant's

---

[3]   On June 8, 2022, the case was randomly reassigned to the undersigned.  June 8, 2022 Order.

failure to pay my firm's invoices."  ECF. No. 32.  In light of this letter, on August 22, 2022, the Court ordered defense counsel and a representative of Defendant to attend the teleconference previously scheduled for September 9, 2022.  ECF No. 34.  Then-defense counsel filed its motion to withdraw as counsel on September 2, 2022, with service to Defendant occurring on the same day.  ECF Nos. 34 & 36.  Despite being ordered to do so, a representative of Defendant failed to attend the teleconference on September 9, 2022.  ECF No. 37.  As a result, the Court ordered then-defense counsel, proposed new defense counsel, and a representative of Defendant attend the subsequent teleconference on October 7, 2022.  *Id*.  This order was served on Defendant on the same day, September 9, 2022.  ECF No. 38.

Of the three parties explicitly order to do so on September 9, 2022, only then-defense counsel attended the status conference on October 7, 2022.  ECF No. 42.  The Court again ordered then-defense counsel, proposed new defense counsel, and a representative of Defendant to attend a teleconference on October 21, 2022.  ECF No. 42.  This Order explicitly put Defendant on notice, that "Defendant's failure to appear may result in Plaintiff filing a motion for default judgment against the defendant."  *Id*.  A copy of this order was served on Defendant on the same day, October 7, 2022.  ECF No. 43.  Defendant failed yet again to appear at the teleconference on October 21, 2022.  ECF No. 44. At this conference, the Court granted defense counsel's request to withdraw,[4] and again explicitly warned Defendant that "if new counsel does not appear for the corporate Defendant in this case by [November 14, 2022], a default will be

---

[4] Then-counsel for Defendant filed a motion for withdrawal and for attorney's fees.  ECF No. 34.  The Court is addressing the remaining portion of this motion – the request for attorney's fees and costs – in a separate Report and Recommendation.

entered against the Defendant pursuant to Fed. R. Civ. P. 55(a)."[5]  *Id*.  This order was served on Defendant the same day, October 21, 2022.  ECF No. 45.

Despite explicit orders to appear on August 22, September 9, October 7, and October 21, 2022, including being put on notice of the potential consequences for failure to do so twice, Defendant for the fifth time failed to appear on November 14, 2022.  ECF Nos. 34, 37, 42, 44. On November 17, 2022, Plaintiff filed a request for Certificate of Default.  ECF No. 46.  The Clerk of the Court filed an Entry of Default against Defendant on December 2, 2022.  ECF No. 47.  Plaintiff filed the instant motion on April 28, 2023.  ECF No. 50.  Defendant never responded to the instant motion or any of the orders of the Court since withdrawal of its counsel.

## II.    LEGAL STANDARD

### A.    Default Judgment

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step process for obtaining a default judgment against a defaulting party.  Fed. R. Civ. P. 55; *see Ramirez v. Clinton Panaderia, Inc.*, No. 20-CV-6143 (JS) (SIL), 2023 WL 2061413, at *4 (E.D.N.Y. Feb. 17, 2023).  First, a plaintiff must obtain an entry of default indicating that a party has "failed to plead or otherwise defend."  Fed. R. Civ. P. 55(a).  Then, "a plaintiff must next seek a judgment by default under Rule 55(b)."  *Ramirez*, 2023 WL 2061413 at *4 (quoting *New York v. Green*, 420 F.3d at 104) (quotation marks omitted).  The decision to grant a motion for default judgment is left "to the sound discretion of the district court."  *Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Found. Contrs. Inc*., 699 F.3d 230, 234 (2d Cir. 2012).  "When a default judgment is entered, the defendant is deemed to have admitted all the well-pleaded allegations in

---

[5] A corporation cannot appear *pro se* in federal court and must be represented by counsel. *See, e.g., Jones v. Niagara Frontier Transp. Auth.*, 722 F.2d 20, 22 (2d Cir. 1983) ("[A] corporation, which is an artificial entity that can act only through agents, cannot proceed *pro se*.").

the complaint pertaining to liability." *Astudillo v. Fusion Juice Bar Inc.*, No. 19-CV-2590 (EK) (CLP), 2023 WL 3802754, at \*9 (E.D.N.Y. Mar. 23, 2023).

However, "just because a party is in default, the plaintiff is not entitled to a default judgment as a matter of right." *Local 1922 Pension Fund v. Broadway Electric Supply, Co., Inc.*, 19-CV-2344 (JS) (AKT), 2020 WL 1931635, at \*4 (E.D.N.Y. Mar. 18, 2020) (quotation marks and citations omitted). Rather, "it remains the plaintiff's burden to demonstrate that those uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action." *Shum v. Jili Inc.*, No. 17-CV-7600 (RPK) (VMS), 2023 WL 2974902, at \*8 (E.D.N.Y. Mar. 19, 2023) (quoting *Gunawan v. Sake Sushi Rest.* (JO), 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012) (collecting cases)) (quotation marks omitted).

In the Second Circuit, when determining whether to grant a default judgment, courts consider the following factors: "(1) 'whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment.'" *Woodway USA, Inc. V. Speedfit LLC*, No. 22-CV-2455 (EK) (RER), 2023 WL 2969334, at \*8 (E.D.N.Y. Feb. 2, 2023) (quoting *Krevat v. Burgers to Go, Inc.* (JS) (AKT), No. 13-CV-6258, 2014 WL 4638844, at \*5 (E.D.N.Y. Sept. 16, 2014)).

### i.   Willfulness

"When a defendant is continually and 'entirely unresponsive,' the defendant's failure to respond is considered willful." *Avedana v. Casa Ofelia's Bakery LLC* (DG) (AKT), No. 20-CV-2214, 2021 WL 4255361 at \*4 (E.D.N.Y. Aug. 19, 2021), *report and recommendation adopted*, No. 20-CV-2214, 2021 WL 4248857 (E.D.N.Y. Sept. 17, 2021) (citations omitted). Therefore, a defendant's failure to appear or respond equates to a willful default. *J & J Sports Prods., Inc. v.*

*Vergara*, No. 19-CV-2382, 2020 WL 1034393 (FB) (VMS), at *7 (E.D.N.Y. Feb. 6, 2020),

*report and recommendation adopted sub nom.*, No. 19-CV-2382, 2020 WL 1031756 (E.D.N.Y.

Mar. 3, 2020).

### ii.    Meritorious Defense

Prior to entering default judgment, a district court is required to "determine whether the

plaintiff's 'allegations establish [the defendant's] liability as a matter of law.'"  *Chen v.*

*Oceanica Chinese Rest., Inc.*, No. 13-CV-4623 (NGG) (PK), 2023 WL 2583856, at *6 (E.D.N.Y.

Mar. 21, 2023) (quoting *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)).  "A defense is

considered meritorious if the evidence submitted 'would constitute a complete defense.'"  *Leger*

*v. Navila Asset Mgmt. Inc.*, No. 20-CV-3820 (EK) (RML), 2023 WL 2352843 at *6 (E.D.N.Y.

Feb. 6, 2023), *report and recommendation adopted*, No. 20-CV-3820, 2023 WL 2349581

(E.D.N.Y. Mar. 3, 2023) (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 98 (2d Cir. 1993)).

"In order to make a sufficient showing of a meritorious defense, a 'defendant need not establish

his defense conclusively, but he must present evidence of facts that, if proven at trial, would

constitute a complete defense.'"  *Geis Constr. S., LLC v. Delahunt*, No. 20-CV-3834 (MKB)

(JMW), 2023 WL 2731692, at *8 (E.D.N.Y. Mar. 31, 2023) (quoting *New York v. Green*, 420

F.3d 99, 109 (2d Cir. 2005)).

### iii.    Prejudice

The final factor for the Court to consider is whether Plaintiffs would be prejudiced if the

motion for default judgment were to be denied.  Denying this motion would be prejudicial to the

Plaintiff if "there are no additional steps available to secure relief in this Court."  *Alvarado v.*

*J.A. Vasquez Landscaping Corp.*, No. 20-CV-04005 (HG) (SJB), 2023 WL 2542702, at *3

(E.D.N.Y. Feb. 14, 2023) (quotation marks and citation omitted).

### B.    Sex Based Discrimination Under Title VII

Title VII of the Civil Rights Act of 1964 provides, in pertinent part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Sexual harassment by a supervisor in the workplace based on the subordinate's sex violates Title VII's prohibition against sex discrimination.  *Daddino v. Sanossian*, No. 16-CV-6638 (JMA) (ARL), 2022 WL 1085542, at *15 (E.D.N.Y. Feb. 25, 2022), *report and recommendation adopted in part*, No. 16-CV-6638, 2022 WL 969744 (E.D.N.Y. Mar. 31, 2022) (citing *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174-175 (2d Cir. 2012)).

Sexual harassment which constitutes sex discrimination under Title VII falls within two categories: *quid pro quo* sexual harassment and hostile work environment.  *Quintero v. Angels of the World, Inc*., No. 19-CV-6126 (DG) (RLM), 2021 WL 4464123, at *8 (E.D.N.Y. Sept. 10, 2021), *report and recommendation adopted sub nom*., No. 19-CV-06126 (DG) (RLM), 2021 WL 4463488 (E.D.N.Y. Sept. 29, 2021).  *Quid pro quo* sexual harassment involves situations in which "submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual." *Id.* (quotation marks and citation omitted).  Under a hostile work environment theory, a plaintiff must show that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Tracey A. King v. North Amityville Fire Co., Inc.*, No. 19-CV-04643 (JMA) (AYS), 2023 WL 4827103, at *10 (E.D.N.Y. July 27, 2023) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

"A court should consider the totality of the circumstances and factors such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance.'" *Richard v. New York City Dep't of Educ.*, No. 16-CV-957 (MKB), 2022 WL 4280531, at *28 (E.D.N.Y. Sept. 15, 2022) (quoting *Boonmalert v. City of New York*, 721 F. App'x 29, 33 (2d Cir. 2018)). "'The kinds of workplace conduct that may be actionable under Title VII . . . include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'" *Redd*, 678 F.3d at 175 (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)). "A plaintiff also must show 'that the complained of conduct . . . creates such an environment because of the plaintiff's protected characteristic.'" *Richard*, 2022 WL 4280561, at *28 (quoting *LeGrand v. Walmart Stores E., LP*, 779 F. App'x 779, 782 (2d Cir. 2019)). Moreover, a corporation "is presumptively liable for sexual harassment in violation of Title VII if the plaintiff was harassed . . . by someone with supervisory . . . authority over the plaintiff." *Redd*, 678 F.3d at 182.

## C.     Retaliation Under Title VII

Title VII provides that it is unlawful for an employer "to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). "To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'" *King*, 2023 WL 4827103, at *11 (quoting *Harper v. Brooklyn Children's Ctr.*, No. 12-CV-4545 (SJF) (GRB), 2014 WL 1154056, at *3 (E.D.N.Y. Mar. 20, 2014)).

### D.    Injunctive Relief Under Title VII

Under Title VII, injunctive relief may be an appropriate remedy when the court determines that an employer "has intentionally engaged in or is intentionally engaged in such unlawful employment practice charged in the complaint[.]" 42 U.S.C. § 2000e-5(g)(1). "'Once a violation of Title VII has been established, the district court has broad, albeit not unlimited, power to fashion the relief it believes appropriate.'" *Am. Council of the Blind of New York, Inc. V. City of New York*, 579 F.Supp.3d 539, 567 n.34 (S.D.N.Y. 2021) (quoting *Bridgeport Guardians Inc. v. City of Bridgeport*, 933 F.2d 1140, 1149 (2d Cir. 1991)). The bounds of the court's discretion are set "'by the purposes of Title VII, which are to prevent discrimination and achieve equal employment opportunity in the future[.]'" *Id*. (quoting *E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012)).

In determining whether to award an injunction, the court considers the balance of equities and consideration of the public interest. *Kinsella v. Bureau of Ocean Energy Mgmt.*, No. 23-CV-02915 (FB) (ST), 2023 WL 3571300, at *2 (E.D.N.Y. May 18, 2023) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). The moving party must demonstrate that "'there exists some cognizable danger of recurrent violation.'" *Equal Emp. Opportunity Comm'n v. AZ Metro Distributors, LLC*, No. 15-CV-05370 (ENV) (PK), 2020 WL 7404432, at *13 (E.D.N.Y. Dec. 16, 2020) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). "Courts will grant injunctive relief against an employer when there is evidence of widespread and continuous retaliation or harassment that indicates that the threat of future bad acts is high." *Id*. (quotation marks and citation omitted). A court may grant injunctive relief even where a defendant has ceased the offending conduct upon consideration of "the bona fides of the [defendant's] expressed intent to comply" with the law, "the effectiveness of the

discontinuance," and "the character of the past violations." *Id*. (quotation marks and citation omitted).  However, there must be "something more than the mere possibility [of recurrent violations] which serves to keep the case alive." *Id*. (quotation marks and citations omitted).

### E.    Damages

Although a party's default is viewed as a concession of all well pleaded allegations of liability, it is not considered an admission of damages.  *Astudillo*, 2023 WL 3802754, at *9 (citation omitted).  Therefore, once a party's default as to liability is established, a plaintiff still must prove damages.  *Id*; *see Metro Found. Contractors, Inc.*, 669 F. 3d 230, 234 (2d Cir. 2012); *Gutman v. Klein*, No. 03-CV-1570, 2010 WL 4975593, at *1 (E.D.N.Y. Aug. 19, 2010) ("'While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation.'") (quoting *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)).  The Court may conduct hearings to determine damages.  Fed. R. Civ. P. 55(b)(2).  However, the Court is not required to hold a hearing "so long as there is a basis, demonstrated through detailed affidavits and other documentary evidence, for the damages awarded." *Rubie's Costume Co., Inc. v. Kangaroo Mfg., Inc.*, No. 16-CV-6517, 2023 WL 2462775, at *4 (E.D.N.Y. Mar 10, 2023).  On a motion for default judgment, a plaintiff has the burden of proving damages to the Court with "'reasonable certainty.'"  *Avail 1 LLC v. Varlas*, No. 19-CV-1922, 2023 WL 4373540, at *8 (E.D.N.Y. July 6, 2023) (citing *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)).

### i.    Compensatory Damages

Violations of Title VII entitle a plaintiff to "reasonable damages that would make the plaintiff 'whole for injuries suffered on account of unlawful employment discrimination.'"

*Zepeda v. Halftime Bar & Grill Corp.*, No. 22-CV-02355 (JMA) (SIL), 2023 WL 266504, at *2 (E.D.N.Y. Jan. 18, 2023) (quoting *Chen v. Marvel Food Servs. LLC*, No. 15-CV-06206 (JMA) (AYS), 2022 WL 4226098, at *2 (E.D.N.Y. Sept. 9, 2022)); *see also Garcia v. Comprehensive Ctr., LLC*, No. 17-CV-8970 (JPO) (BCM), 2019 WL 8274296, at *5 (S.D.N.Y. Nov. 21, 2019), *report and recommendation adopted*, No. 17-CV-8970 (JPO), 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020) (quotation marks and citation omitted) ("Victims of employment discrimination are entitled to reasonable damages that would make the plaintiff whole for injuries suffered on account of unlawful employment discrimination."); *Santiago v. Crown Heights Ctr. for Nursing & Rehab.*, No. 15-CV-4381 (DLI) (CLP), 2017 WL 9482107, at *23 (E.D.N.Y. Feb. 24, 2017), *report and recommendation adopted as modified*, No. 15-CV-4381, 2017 WL 4410807 (E.D.N.Y. Sept. 30, 2017) ("Courts have awarded damages for emotional distress under Title VII, Section 1981, the NYSHRL and the NYCHRL.").

"The Second Circuit sorts emotional distress claims into three categories of claims: garden-variety, significant or egregious." *Miller v. E. Midwood Hebrew Day Sch.*, No. 19-CV-5580 (JMA) (SIL), 2021 WL 966166, at *7 (E.D.N.Y. Feb. 15, 2021) (quotation marks and citation omitted). First, "[g]arden variety emotional distress claims lacking extraordinary circumstances and without medical corroboration generally merit $5,000 to $35,000 awards." *Tenecora v. Ba-kal Rest. Corp.*, No. 18-CV-7311 (DRH) (AKT), 2020 WL 8771256, at *19 (E.D.N.Y. Nov. 30, 2020), *report and recommendation adopted in part*, No. 18-CV-7311 (DRH) (AKT), 2021 WL 424364 (E.D.N.Y. Feb. 8, 2021) (quotation marks and citations omitted); *Antoine v. Brooklyn Maids 26, Inc.*, No. 19-CV-5676 (KAM), 2020 WL 5752186, at *16 (E.D.N.Y. Sept. 26, 2020) ("For 'garden-variety' emotional distress claims, where plaintiff 'did not seek medical treatment but [ ] the evidence in the form of plaintiff's testimony describes

shock, nightmares, sleeplessness, humiliation, and other subjective distress,' courts have awarded damages ranging from $5,000 to $35,000.") (citations omitted).  Second,"[s]ignificant" emotional distress claims typically involve "substantial harm that is often corroborated by witnesses or is evidenced by medical documents" and "damages for this type of claim range from $50,000 to $100,000." *Quintero*, 2021 WL 4464123, at *15 (quotation marks and citation omitted).  Third, "[e]gregious emotional distress claims justifying awards exceeding $100,000 have only been warranted where the discriminatory conduct was outrageous and shocking or where the physical health of plaintiff was significantly affected." *Id*. (quotation marks and citation omitted).

Finally, when awarding compensatory damages, courts "have considered the duration, severity, consequences and physical manifestations of the mental anguish, as well as any treatment that plaintiff underwent as a result of her anguish." *Tenecora*, 2020 WL 8771256, at *19 (quotation marks and citations omitted).

### ii.    Back Pay

Under Title VII, a plaintiff is generally, but not automatically, entitled to an award of back pay from the date of termination to the date of the judgment.  *Antoine*, 489 F. Supp. 3d at 92 (citing *DeCurtis*, 2011 WL 4549412, at *3).  "The awarded backpay or lost salary is the amount of monies the injured party would have earned but-for the discriminatory conduct." *Lewis v. Am. Sugar Ref., Inc.*, 325 F. Supp. 3d 321, 361 (S.D.N.Y. 2018).  Any uncertainties in determining back pay should be resolved against the employer.  *Astudillo*, 2023 WL 3802754, at *10 (awarding back pay based on the plaintiff's "sworn declaration containing information as to hours worked and rates of pay based on estimation and recollection," even though the information provided was "general and not detailed") (citation omitted).

### iii.    Pre-Judgment Interest

Pre-judgment interest on back pay awards is an element of complete compensation. *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 230 (E.D.N.Y. 2018) (citing *Loeffler v. Frank*, 486 U.S. 549, 558 (1988)).  "Title VII authorizes a district court to grant pre-judgment interest on a back pay award to discourage employers from attempting to purposely delay paying back wages." *Joseph v. HDMJ Restaurant, Inc.*, 970 F.Supp.2d 131, 151 (E.D.N.Y. 2013) (collecting cases).  The court should apply "the federal interest rate based on the average rate of return on one-year Treasury bills for the relevant time period between the time the claim arises until the entry of judgment pursuant to 28 U.S.C. § 1961(a)." *Villalta v. JS Barkats, P.L.L.C.*, No. 16-CV-2772 (RAR) (WL), 2021 WL 2458699, at *13 (S.D.N.Y. Apr. 16, 2021), *report and recommendation adopted*, No. 16-CV-2772 (RA), 2021 WL 2458023 (S.D.N.Y. June 16, 2021) (quotation marks and citation omitted). Prejudgment interest should be calculated from the time the claim arises through the date of judgment as follows:

> First, the [back pay] award[ ] should be divided pro rata over the appropriate time period. Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied. Third and finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually.

*United Health Programs of Am., Inc.*, 350 F. Supp. 3d at 230 (E.D.N.Y. 2018) (quotation marks and citation omitted).

### iv.    Punitive Damages

The showing required for an award of punitive damages is not the same as that required for liability.  *See Santiago v. Fischer*, No. 12-CV-2137 (KAM) (SLT), 2023 WL 2974201, at *8 (E.D.N.Y. Apr. 16, 2023) (citing *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir.

2015)).  Under Title VII, a plaintiff may recover punitive damages if she demonstrates that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  Punitive damages are appropriate only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Santiago*, 2023 WL 2974201, at *8 (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)) (quotation marks omitted).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  *Kolstad*, 527 U.S. at 535. The employer's state of mind may be "inferred from the circumstances."  *Tenecora*, 2020 WL 8771256, at *25 (quoting *Manzo v. Sovereign Motor Cars, Ltd.*, 2010 WL 1930237, at *2 (E.D.N.Y. May 11, 2010), *aff'd*, 419 Fed. App'x 102 (2d Cir. 2011)) (quotation marks omitted). "[E]gregious or outrageous acts may serve as evidence supporting an inference" of the employer's motive or intent.  *Kolstad*, 527 U.S. at 538; *see also Manswell v. Heavenly Miracle Acad. Servs., Inc.*, No. 14-CV-7114 (MKB) (SMG), 2017 WL 9487194, at *19 (E.D.N.Y. Aug. 23, 2017) ("A plaintiff seeking punitive damages under Title VII must present evidence that (1) the employer discriminated (or retaliated) against him with conscious knowledge it was violating the law, or (2) that it engaged in egregious or outrageous conduct from which an inference of malice or reckless indifference could be drawn.") (quotation marks and citation omitted).

The Supreme Court has delineated several factors for courts to consider in assessing the reasonableness of punitive damages, including: "(1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the

plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases." *Antione*, 2020 WL 5752186, at *5 (citing *DeCurtis v. Upward Bound Int'l, Inc.*, No. 09-CV-5378, 2011 WL 4549412, at *5 (S.D.N.Y. Sept. 27, 2011); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)) (quotation marks omitted).  However, "[a]wards of punitive damages are by nature speculative, arbitrary approximations." *Shuford v. Cardoza*, No. 17-CV-6349 (JRC), 2023 WL 2706255, at *15 (E.D.N.Y. Mar. 30, 2023) (quoting *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013)) (quotation marks omitted).  Thus, the court's ultimate responsibility is to ensure that awards for punitive damages are "fair, reasonable, predictable, and proportionate." *Payne*, 711 F.3d at 93.

The court also is required to consider the defendant's financial circumstances in determining an award of punitive damages, no matter how egregious the underlying conduct. *Tencora*, 2020 WL 8771256, at *26 (citing *Patterson v. Balsamico*, 440 F.3d 104, 121 (2d Cir. 2006)).  Moreover, where, as here, liability for punitive damages is sought to be imposed upon an employer for the malicious or recklessly indifferent discrimination of its agents, a plaintiff must demonstrate that the "employee serving in a 'managerial capacity' committed the wrong while 'acting in the scope of his employment,'" unless the agent's "discriminatory employment decisions . . . [were] contrary to the employer's good-faith efforts to comply with Title VII." *Id*. (citing *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 384-85 (2d Cir. 2001)) (quotation marks omitted).

## III.    DISCUSSION

Here, the Court finds (1) Plaintiff has adequately pled facts to support its motion for default judgment; (2) Plaintiff has adequately pled facts to demonstrate a Title VII sex-based discrimination violation and retaliation; (3) Plaintiff is entitled to compensatory and punitive

damages; (4) Plaintiff is entitled to injunctive relief (with the exception of an independent monitor, which the undersigned recommends against imposing); (5) Claimant Julia Rondeau is entitled to back pay plus prejudgment interest.

### A.    Plaintiff Has Adequately Pled Facts to Support Its Motion for Default Judgment, as Defendant Willfully Defaulted

Here, Defendant's then-counsel filed a letter with the Court as early as August 19, 2022, stating counsel's intention to file a motion to be relieved as defense counsel due to a breakdown in communications with Defendant and Defendant's failure to pay attorney's fees.  ECF No. 32. The nonresponsive Defendant then failed to retain new counsel as directed, missed no less than three court conference which they were explicitly directed to attend, and failed to comply with any subsequent Court orders.  ECF Nos. 34, 37, 42, 44.

Having previously appeared through counsel and participated in a settlement conference on June 2, 2022, the nonresponsive Defendant is unquestionably aware of this proceeding. "Based on defendants' radio silence, 'the only reasonable inference is that . . .  defendants willfully abandoned their defense of this case.'"  *Maldonado v. Loxton Inc.*, No. 20-CV-5776 (LDH) (RLM), 2022 WL 18858967, at *4 (E.D.N.Y. June 9, 2022) (citations omitted); *Xin Hao Liu v. Millenium Motors Sports, LLC*, No. 17-CV-6438 (RPK) (RER), 2020 WL 7028924, at *3 (E.D.N.Y. Nov. 5, 2020), *report and recommendation adopted sub nom.*, No. 17-CV-6438 (RPK) (RER), 2020 WL 7024378 (E.D.N.Y. Nov. 30, 2020) ("Courts in this District find a litigant's actions to be willful when there has been unexplained and repeated failure to respond to discovery requests, comply with court orders, and appear in a scheduled hearing.") (collecting cases).

The undersigned's October 21, 2022 Order explicitly put the nonresponsive Defendant on notice that a default judgment could be entered against them.  ECF No. 44.  The Order

specifically states, "[I]f new counsel does not appear for the corporate Defendant in this case by 11/14/2022, a default will be entered against the Defendant pursuant to Fed. R. Civ. P. 55(a)." *Id*. Finally, the period of noncompliance also weighs in favor of granting default judgment. *Loc. Union No. 40 of the Int'l Ass'n of Bridge v. Car-Wi Const.*, 88 F. Supp. 3d 250, 265 (S.D.N.Y. 2015) (noting "durations of time as brief as a few months have been held to weigh in favor of dispositive sanctions") (collecting cases). As of the date of this Report and Recommendation, Defendant has been nonresponsive for over ten months.[6]

### B.    Plaintiff Has Adequately Pled Facts to Demonstrate a Title VII Sex-Based Discrimination Violation and Retaliation

The Complaint alleges (and the declarations demonstrate) that many of the women who worked at Colony Diner were subjected to a work environment in which they were constantly sexualized and ridiculed because of their gender. ECF No. 1 ¶¶ 21-22; ECF 50-11 ¶ 6, 12; ECF 50-6 ¶ 12, 18; ECF 50-9 ¶¶ 11-13; ECF No. 50-13 ¶ 9; ECF 50-10 ¶ 10; ECF 50-12 ¶¶ 7-10. The Complaint further alleges (and the declarations further demonstrate) that at least ten female employees were subjected to unwanted physical contact by George Strifas, and other male employees on several occasions, including sexual assaults. ECF No. 1 ¶¶ 21, 23; ECF No. 50-5 ¶¶ 14, 16-18; ECF No. 50-11 ¶ 3; ECF No. 50-9 ¶ 13; ECF No. 50-6 ¶ 11; ECF No. 50-7 ¶ 16; ECF No. 50-8 ¶ 9. The persistent and unwelcome physical contact created a hostile and abusive work environment for the Claimants.

In addition to unwelcome physical contact, the Complaint alleges that George Strifas and other male employees propositioned female employees, including explicit

---

[6] The Court notes, by contrast, that Defendants (as well as George and Thomas Strifas) have appeared via counsel and are now defending themselves in a separate case in this District. *Danowski v. Stardust Diners, Inc. et al.*, 2:23-cv-01826 (JMA) (LGD) (E.D.N.Y.).

requests for sex, and routinely made sexually suggestive remarks. ECF No. 1 ¶¶ 22, 23; ECF No. 50-11 ¶ 5; ECF No. 50-6 ¶¶ 7-10; ECF No. 50-9 ¶¶ 8-10; ECF No. 50-5 ¶¶ 8-9; ECF No. 50-7 ¶¶ 5-7; ECF No. 50-10 ¶ 8; ECF No. 50-13 ¶ 5; ECF No. 50-8 ¶ 8. These sexual advances and lewd comments also contributed to the sexually hostile work environment for Claimants. As described in more detail in their declarations and the facts section above, the Claimants' emotional distress included the following:

• **Anny Benitez-Roa**, a teenager, was subjected to unwelcome sexual advances, nonconsensual physical touching by her boss and various coworkers, and was sexually assaulted by George Strifas. ECF No. 50-5 ¶¶ 14-22, 25. Benitez-Roa suffered from severe depression, withdrew from friends, suffered persistent feelings of dread, and lost weight despite being pregnant. *Id*. ¶¶ 29-32.

• **Julia Rondeau**, a college sophomore working her first restaurant job in New York, was subjected to constant unwanted intimate contact, a steady barrage of sexual comments by her boss, and excessive focus on her body and the bodies of other women at the diner. ECF No. 50-6 ¶¶ 10-26. This hostile work environment caused her severe anxiety, panic attacks, depression, and reactivated her eating disorder. *Id*. ¶ 31. Although Rondeau began working for Defendant prior to May 12, 2015, the date three-hundred days before the charges in this Title VII case were filed, she can recovery for all of the harassment that she suffered between when she began working at Defendant and when she quit in August 2015 under the continuing violation theory. *See Dash v. Bd. of Educ. of City Sch. Dist. of New York*, 238 F. Supp. 3d 375, 389 (E.D.N.Y. 2017) ("Because some of the events plaintiff pleads . . . took place after February 2013 and are part of a continuing violation, plaintiff may proceed with a hostile work environment

claim, regardless of whether the acts complained of occurred before or after February 13, 2013.").  Under the continuing violation theory, "the incidents constituting a hostile work environment are part of one unlawful employment practice," and therefore "[a defendant] may be liable for all actions that are part of [a] single claim," provided that one act within the claim is timely.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).

• **Natalie Escorza**, a teenager, suffered constant sexual harassment from George Strifas, older busboys, and waitstaff.  ECF No. 50-7 ¶¶ 6-17, 21-35.  They would constantly comment on her body and touch her intimately without her consent.  *See id*.  Escorza suffered from severe anxiety, her personality changed, she lost weight, and she sought treatment from a therapist.  *Id*. at ¶ 39.

• **Alyssa Cosgrove**, a teenager, was subjected to constant sexual comments and touching in a sexual manner from George Strifas for years, and she watched him grope and abuse her teenage co-worker.  ECF No. 50-8 ¶¶ 7-12.  This caused her significant anxiety, specifically around her body image, and depression.  *Id*. ¶¶ 14-15.

• **Donna Maiorano** worked at Colony Diner for several years and was constantly objectified and denigrated.  ECF No. 50-9 ¶¶ 5-20.  George Strifas would show her pornography and she was constantly subjected to unwanted physical contact.  *Id*.  The constant harassment was a constant source of frustration and humiliation leading to depression and trouble sleeping.  *Id*. ¶¶ 24-26.

• **Christina Swenson** worked at Colony Diner for years. ECF No. 50-10 ¶ 3.  Thomas Strifas would humiliate her, she was subjected to degrading sexual inquiries, and she observed her co-worker sexually abused and humiliated.  *Id.* ¶¶ 6-16.  Swenson

became depressed, had trouble sleeping, suffered from nausea and stomach pains, and lost fifteen pounds while working at Colony Diner. *Id*. ¶¶ 19-22.

   • **Jelyssa Fuertes**, a teenager, was subjected to unwanted sexual advances and physical contact from George. ECF No. 50-11 ¶¶ 3, 5-10, 12-13. The harassment was exhausting, but she was compelled to work in that kind of environment to make money. *Id*. ¶ 18. Fuertes continued to feel self-conscious about her appearance for a long time and lost her confidence and self-respect, feeling ashamed for putting up with such an abusive environment. *Id*. ¶ 19.

   • **Page Swinerton**, a young college student, was subjected to constant unwanted sexual advances and intimate contact from older busboys, often in front of her managers, on almost every shift. ECF No. 50-12 ¶¶ 14-22. Additionally, she endured George and Thomas Strifas' constant comments about her body and their denigration of women and disparate treatment of their female staff. *Id*. ¶¶ 7-11. This behavior caused Ms. Swinerton severe anxiety, interfering with her ability to sleep. *Id*. ¶¶ 27-31.

   • **Paula Schuricht** was subjected to constant unwanted sexual comments from George Strifas, who would scream at her mercilessly if he did not like her appearance. ECF No. 50-13 ¶¶ 5-10. She was constantly disrespected because she was a woman, subjected to derogatory comments from her male co-workers, and given lesser diner sections than them. *Id*. ¶¶ 10-13.

   • **Jessica Costa** was subjected to constant unwanted sexual comments and contact from George Strifas, who would scream at her if she did not acquiesce. ECF No. 50-14 ¶¶ 5-11. The humiliation abuse she suffered at the hands of George Strifas gave her

flashbacks of the sexual abuse she had suffered as a child and teenager.  *Id*. ¶¶ 18-20.
She grew depressed and sought treatment from a psychiatrist.  *Id*. ¶ 21.

Additionally, when female employees objected to the unlawful behavior, George
Strifas retaliated by changing their shifts and assigning them to less lucrative stations in
the restaurant.  ECF No. 1 ¶ 25.  Furthermore, Claimants feared retaliation if they
rejected George Strifas' advances or complained about mistreatment.  ECF No. 50-8 ¶¶ 9,
11; ECF No. 50-10 ¶¶ 7, 11; ECF No. 50-7 ¶ 8; ECF No. 50-9 ¶ 6; ECF No. 50-5 ¶ 12;
ECF No. 50-6 ¶ 11.

### C.    Claimants Are Entitled to Compensatory and Punitive Damages

The Court finds that the emotional distress the described in the Claimants'
declarations support compensatory damage awards of $35,000 per Claimant.  *See Setty v.
Fitness*, No. 17-CV-06504 (NGG) (SMG), 2018 WL 8415414, at *18 (E.D.N.Y. Dec. 18,
2018), *report and recommendation adopted sub nom.*, No. 17-CV-6504 (NGG) (SMG),
2019 WL 1292431 (E.D.N.Y. Mar. 21, 2019) (awarding $25,000 to $35,000 to Claimants
for a hostile work environment that caused emotional distress).  The Court notes this
$35,000 is less than the $50,000 requested for *compensatory damages* requested per
Claimant by Plaintiff.  *See* ECF No. 50 at 24.

However, Defendant's egregious conduct demonstrates the "malice" necessary to support
an additional award of punitive damages to each Claimant.  As described in more detail above,
George and Thomas Strifas used their positions as owners of Colony Diner to exploit and prey
upon women who relied on them for a paycheck.  ECF No. 1 ¶¶ 21-25.  They subjected them to
unwanted sexual advances, unwanted physical contact, and even sexual assault.  *Id*.

Moreover, Defendant was recklessly indifferent to the fact that its conduct violated
federal law.  George Strifas ridiculed the possibility of a lawsuit rather than take his employees'

complaints seriously.  ECF No. 50-10 ¶ 17; ECF No. 50-6 ¶ 28.  Critically, he continued this egregious behavior long after the instant EEOC charges were filed in 2016 (*see* ECF No. 50-5 ¶¶ 3, 20; ECF No. 50-8 ¶ 4) and after this lawsuit began.  ECF No. 50-7 ¶ 3.  Thus, in light of the persistent and reprehensible nature of Strifas's misconduct, his continual targeting of vulnerable employees, and his clear knowledge that his and others' conduct violated the law, additional punitive damages should be awarded in the amount of $15,000 for each Claimant.[7]  This results in total compensatory and punitive damages of $50,000 per Claimant.

>    **D.    Plaintiff is Entitled to Injunctive Relief**

First, Plaintiff has demonstrated a likelihood that the Title VII violations will reoccur. The nature of Defendant's past conduct, which was widespread and longstanding, supports a finding that violations are likely to be repeated.  *United Health Programs*, 350 F. Supp. 3d at 213 (citing *W.T. Grant,* 345 U.S. 629 at 633) (explaining that the court may consider, inter alia, "the character of past violations" when determining whether to award injunctive relief).

Here, Defendant has been found liable for Title VII violations in the form of maintaining a hostile work environment over six years with respect to ten claimants and constructively discharging Ms. Rondeau based on her gender.  Defendant's highest-ranking officers and managers, including owners George and Thomas Strifas, conducted and permitted Title VII violations.  ECF No. 1 ¶¶ 20-25; ECF No. 50.  The length of time during which these practices persisted also support a finding that there is a likelihood of recurrence.  Many of the practices described above spanned multiple years.  *See generally id.*  Furthermore, as alleged in Plaintiff's

---

[7] 42 U.S.C. § 1981a places a limitation on damages of $50,000 per claimant in total compensatory and punitive damages for an employer with between fifteen and one-hundred employees (which is alleged here).  *See* ECF No. 1 ¶ 4; ECF No. 13 ¶ 4.  Thus, $15,000 in punitive damages per claimant, when added to the $35,000 in compensatory damages per claimant, reached this statutory cap of $50,000 per claimant.

filings, Defendant's owner openly mocked the possibility of being held accountable in court. ECF No. 50-8 ¶ 17 ("George and Tommy would do all of this out in the open. . . . [T]hey knew the law prohibited sexual harassment. We had the EEOC-mandated 'EEO It's the Law' poster posted by the cash register . . . .  One of the other waitresses . . . would constantly tell them that their behavior violated the law and that she would file an EEOC charge. George and Tommy would just laugh it off. They did not dispute that their behavior violated the law, they just said 'nobody will believe you.'"); ECF 50-6 ¶ 28 ("[George] would make light of anyone asserting their rights. I would often hear him joking to female employees with whom he was flirting with that he 'better watch out or we will get sued again.'").  Critically, Defendant allowed this egregious behavior long after the instant EEOC charges were filed in 2016, and after this lawsuit began.  ECF No. 50-5 ¶¶ 3, 20; ECF No. 50-8 ¶ 4; ECF No. 50-7 ¶ 3.

###### E.    Permanent Injunctive Relief

Plaintiff asks that the Court order a permanent injunction ordering Defendant to (1) refrain from sex-based discrimination and harassment, and (2) refrain from retaliating against those who have previously, or those who will in the future, speak out against or report this type of sex-based discrimination and harassment.  ECF No. 50-15 ¶ II.

Regarding first prong of Plaintiff's request for permanent injunctive relief, Plaintiffs the following order: "Defendant, their managers, officers, agents, contractors, successors, purchasers, assigns, and any corporation or entity into which Defendant may merge or with which Defendants may consolidate, and any persons acting on Defendant's behalf is permanently enjoined from creating, maintaining, encouraging, condoning, and/or failing to prevent or correct harassment because of sex, including creating or maintaining a hostile work environment." *Id*.

With respect to the second prong of plaintiff's request for permanent injunctive relief, plaintiffs request the order further state:

> Defendant, their managers, officers, agents, contractors, successors, purchasers, assigns, and any corporation or entity into which Defendant may merge or with which Defendants may consolidate, and any persons acting on Defendant's behalf is permanently enjoined from engaging in reprisal or retaliation of any kind against any person because of such person's opposition to or refusal to participate in any practice made unlawful under Title VII. Defendant shall not retaliate against a person because such person brings an internal complaint of discrimination with Defendant; because such person files or causes to be filed a charge of discrimination with the EEOC or any other agency charged with investigating employment discrimination complaints or whose statements serve as the basis of a charge; or because such person testifies or participates in the investigation or prosecution of an alleged violation of Title VII. Defendant shall not retaliate in any manner against any individuals identified as Aggrieved Individuals, witnesses, or who assisted in the investigation giving rise to this action. Nor shall Defendant retaliate against any such persons identified as a witness or possible witness of discrimination in future investigations or proceedings.

*Id.*; s*ee United Health* Programs, 350 F. Supp. 3d at 219 (ordering permanent injunctive relief with similar language and collective cases discussing similar relief).

Given the nature of the unlawful employment practices here, the undersigned recommends this order.  Injunctions with similar language prohibiting harassment and retaliation are appropriate when there is a longstanding record of violations of Title VII.  *See United Health* Programs, 350 F. Supp. 3d at 219.

## F.    Temporary Injunctive Relief

Plaintiff also requests a number of temporary injunctions relating to (1) posting and notice of Equal Employment Opportunity information and rights, (2) establishment of employment anti-discrimination policies and procedures, (3) acquisition of an independent monitor, (4) training, and (5) recordkeeping and reporting.  ECF No. 50-15 ¶ III.  The requested duration of these various injunctions is a period of five years.  *Id*.

As Plaintiff notes, imposing a term of five years for affirmative injunctive relief is appropriate when there is evidence that a hostile work environment has been maintained for years and there is no evidence that it has ceased.  *United Health Programs*, 350 F. Supp. 3d at 221 (imposing a five-year term where hostile work environment spanned five years and "there is no way of knowing if the discriminatory practices have ceased.").

As such, the Court recommends granting all the temporary injunctive relief requested as it appears in Plaintiff's proposed judgment and order, except that the Court rejects the requested imposition of an independent monitor.  ECF No. 50-15 ¶ III.  While not condoning Defendant's conduct, the undersigned finds that the imposition of an independent monitor for a restaurant of this size is overbroad, unduly burdensome, and disproportionate.  The cases cited by Plaintiff in support of this request (ECF No. 50-1 at 37) involve much larger organizations than a local diner at issue in the instant action.  *See United States v. City of New York*, 717 F.3d 72, 97 (2d Cir. 2013) (ordering a monitor for the New York City Fire Department); *Equal Emp. Opportunity Comm'n v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 221 (E.D.N.Y. 2018) (defendant was a local health care company that was represented a large international law firm, Baker & Hostetler LLP).  The Court therefore should exercise its discretion and reject imposition of an independent monitor.  *See generally E.E.O.C. v. KarenKim, Inc.,* 698 F.3d 92, 99 (2d Cir. 2012).

### G.    Claimant Rondeau is Entitled to Back Pay and Prejudgment Interest

Because Julia Rondeau was constructively discharged, she is entitled to back pay. Rondeau made approximately $700 dollars a week at Colony Diner.  ECF No. 50-4 ¶ 4. After quitting the diner, she was unemployed for two months before she found a new job making approximately $155 per week, roughly $545 less than she was making at Colony Diner.  *Id*. ¶ 32.  After leaving that job for another one that paid about the same amount,

she continued to work until 2017, when she quit to focus on school.  Accordingly, Rondeau is awarded $42,660 in back pay.[8]

The undersigned recommends that the Clerk of Court be directed to use the above-mentioned methodology to calculate the pre-judgment interest on the back pay award.  The Clerk of Court should divide the back pay award of $42,660.00 pro rata from August 3, 2015 to the date of judgment and apply the average annual United States Treasury bill rate of interest referred to in to 28 U.S.C. § 1961(a) from 2015 to 2023; the interest should be compounded annually.  *See Villalta*, 2021 WL 2458699, at *13 (awarding pre-judgment interest pursuant to this calculation).

## IV.    CONCLUSION

For the above reasons, the undersigned recommends that Judge Vitaliano (1) grant Plaintiff's motion for default judgment, and (2) grant in part and deny in part the requested relief.  Specifically, the undersigned recommends granting all the requested relief, except that the undersigned recommends (1) an award of $35,000 in compensatory damages per claimant plus $15,000 in punitive damages (rather than the $50,000 in compensatory damages requested by Plaintiff), and (2) denial of the requested imposition of an independent monitor.

## V.    OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2), the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6(a) & (d) (addressing computation of days).  Any requests for an extension of time for filing objections must be directed to Judge Vitaliano.  FAILURE TO FILE TIMELY OBJECTIONS

---

[8] This amount was calculated by Plaintiff by multiplying $700 by 8 weeks of unemployment, followed by multiplying $545 by 68 weeks of underemployment until Rondeau quit her job in February 2017 to focus on school.  ECF No. 50-1 at 27 n.5.

SHALL CONSTITUTE A WAIVER OF THOSE OBJECTIONS BOTH IN THE DISTRICT COURT AND ON LATER APPEAL TO THE UNITED STATES COURT OF APPEALS. *See Thomas v. Arn*, 474 U.S. 140, 154-55 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *F.D.I.C. v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995).

**SO ORDERED**:

Dated: Central Islip, New York
        August 10, 2023

/s/ Lee G. Dunst
LEE G. DUNST
United States Magistrate Judge